# SUPREME COURT.

## IRA C. BRAND, appellant, agt. WILLIAM G. BRAND and ALIDA BRAND, respondents.

On an appeal in an action in equity, to set aside a deed of real estate, and also a bill of sale of personal property, on the ground of *fraud and undue influence;* and also on the ground that the grantor was *incapable of fully understanding the nature and effect of such transfer:*

*Held,* that it was clear from the whole case, as presented by the referee's report, that the referee considered the question of competency on the part of the plaintiff, (the grantor,)' and of fraud and undue influence on the part of the defendant, (his son,) as a close one; therefore, the court must take it for granted that he took the facts assumed and found by him into the account, in arriving at the conclusion not to set aside the deed and bill of sale.

And where the referee found, as one of the findings of fact, that, " It seems he (the plaintiff,) still remains with William, (the defendant,) eats at his table, and is kindly treated by him, and his wants carefully provided for," when there is no evidence in the case to warrant such a finding, it is error : *First,* in assuming the fact without evidence ; and, *second,* in giving it any weight in the determination of the issues.

The law in regard to prohibiting an *attorney or counsel* of a party, from testifying to the statements of his client against his consent, is the same now as it was before the Code made parties competent witnesses, for or against themselves. *Per* FOSTER, *J.*

The decision in the case of *Whiting* agt. *Barney.* (30 *N. Y.*, 330,) in which Judge SELDEN came to the conclusion that the rule is changed, does not declare any such changed rule; as each of the four judges who concurred with him in a reversal of the judgment of the supreme court, did so on the ground that the communication was made to the counsel *in the presence of the adverse party,* and that, therefore, it was *not confidential.* The decision of the case, therefore, was made irrespective of the provisions of the Code, and in conformity with the pre-existing rule, that, to be privileged, the communication must have been *confidential.* Besides, the Code ( § 390) does not furnish any reason for changing the rule of evidence. *Per* FOSTER, *J.*

The former rule which forbids the *clerk* of the attorney or counsel of a party from testifying to communications of the party made to his counsel, in the presence of the clerk—they being *confidential and privileged*—is still in force. *Per* FOSTER, *J.*

Communications to counsel made in the presence of the adverse party are *not privileged,* and the counsel is a competent witness thereon; but where the counsel testifies that the adverse party was not present all the time at the interview, while the communications of the plaintiff were being made to his counsel, and he

Brand agt. Brand.

(the counsel) was allowed by the referee, against objection, to testify, as well to what the plaintiff said while the defendant was absent, as what he said while he was present: *held, error. Per* FOSTER, J.

Communications made to counsel as a *conveyancer* are *privileged. Per* FOSTER, J.

A *subscribing witness* to a *deed* is within the same principle which allows the sub-scribing witness to a last will and testament, to give his opinion of the sanity of the testator, and may give his opinion (though not an expert) as to the compe-tency of the grantor to contract, at the time of the execution of the deed.

Where a witness, not properly an expert, but a person of high character, was called to testify as to the competency of the plaintiff for the transaction of business, whom he had known for many years, was asked the following question: "Where any fear of difficulty might threaten him or his property, would he, in your judg-ment, be easily persuaded to do any act, dictated by any person he considered a friend?"

*Held,* that the witness was competent to answer this question, on the ground that the acts and conduct of the plaintiff, and of his family, in regard to his business matters, which he (the witness) had testified to, made him so. That is, such statements rendered the witness competent, in connection therewith, to express an opinion.

The rule laid down by the court in the case of *Whelan* agt. *Whelan,* (3 *Cow.,* 572,) *held* applicable to this case on its merits, to wit: "That a contract obtained from one party, so much in the power of the other, cannot be manitained, if confidence has been abused; if there is inadequacy of price, or the inference is plain that advantage has been taken of age and imbecility, and the partiality of a parent has been artfully made use of, to strip him of his property and reduce him to a state of dependence and want."

*Held,* that the facts of this case, as proved and referred to by the court, and the several specific facts found by the referee, taken as a whole, appear to be adverse to the general conclusion of the referee that the plaintiff was not incompetent to contract, and that it is not proved that the defendant committed a fraud or unduly influenced him:

On the contrary, the court is satisfied that this judgment should be reversed, as well upon the question of evidence adverted to, as upon the findings of the referee. And that the case shows a much stronger one for an interference to set aside the conveyances, than was that of *Whelan* agt. *Whelan,* (3 *Cow.,* 537.) *Per* FOSTER, J.

And the case is still stronger in favor of the plaintiff in regard to the *bill of sale* of the personal property; where it is perfectly clear that the plaintiff only intended to give the use of the personal property to the defendant, and that for one year only, instead of making an absolute title of it to the defendant in perpetuity. *Per* FOSTER, J,

Judgment reversed and new trial granted, costs to abide event.

*Onondaga General Term, April, 1870.*

BACON, FOSTER *and* MORGAN, *Justices.*

1868, February 13th, action commenced by service of summons only.

1868, February 14th, complaint filed, with notice of *lis pendens.*

1868, February 14th, Raynor & Vann appeared for defendants.

1868, February 29th, twenty days additional time given to serve a copy of the complaint.

1868, March 12th, copy of complaint served on defendants' attorneys.

1868, March 28th, defendant William G. Brand served answer, and Alida Brand served demurrer.

1868, June 23d, at special term, the demurrer dismissed, and the cause referred to Hon. LE ROY MORGAN, as sole referee, &c.

SUPREME COURT—ONONDAGA COUNTY.

| | |
|---|---|
| IRA. C. BRAND,<br>*against*<br>WILLIAM G. BRAND and<br>ALIDA BRAND. | *Summons for relief.* |

*To the above-named defendants:*

YOU are hereby summoned to answer the complaint of Ira C. Brand. plaintiff, a copy of which will be filed in the clerk's office of the county of Onondaga, and to serve a copy of your answer on the subscribers at Syracuse, within twenty days after the service of this summons, exclusive of the day of service, or the plaintiff will apply to the court for the relief demanded in the complaint.

FULLER & BARTLETT,
*Plaintiff's Attarneys.*

*(Title of cause.)* COMPLAINT.

The complaint of Ira C. Brand, the plaintiff in this suit, respectfully shows, that he will be seventy-five years old on the 10th day of August, 1868, and has for above thirty years last past, resided in the town of Geddes, Onondaga County. That the said defendant, Alida Brand, is the wife of the said defendant, William G. Brand, as plaintiff is informed and believes, and is now living and cohabiting with him as such. That on the 25th day of June last his wife died; that he has living two sons, both residents of said county. That during the summer of 1867, the plaintiff was sick and under the doctor's care, being confined to his house, and some of the time to his bed, for the space of several weeks That the mind of said plaintiff, from the effects of such sickness and the loss of his wife, added to the infirmities of age and physical debility, became so impaired as to render him wholly incapable of transacting his own business, and to make him wholly dependent upon others for the management of his affairs, and that the said plaintiff has ever since remained, and is now weak in body and mind, and incapable of managing his own affairs with adequate discretion. That the said defendant, William G. Brand, who is the youngest son of said plaintiff, has, since the second week of November, 1867, lived in the house of said plaintiff, and having the entire confidence of this plaintiff, has acted as his agent in all his business transactions, and exercised entire and exclusive

control over the same. That the said plaintiff on and prior to the 29th day of January, 1868, was the owner in fee of a certain farm at his said place of residence, worth at least $7,500 ; and personal property, consisting of horses, cows, swine and farming utensils, to the value of at least $500. That the said William G. Brand, designedly, to obtain the property aforesaid of said plaintiff for little or no consideration, knowing the influence he already possessed over said plaintiff, with the design aforesaid, and the better to enable him to accomplish his purposes, appeared to take an unusual interest in the welfare of the said plaintiff, and by flattery and various other devices, as the youngest son and the confident adviser and agent of said plaintiff, acquired such an undue influence over him, as to obtain and exercise entire control of the mind and business matters of the said plaintiff. That said plaintiff, still being so enfeebled and weak in mind, and incompetent, and under the influence of the said defendant, William G. Brand, was induced and influenced by the said William G. Brand, to make and execute the writing, a copy of which is hereto annexed, marked " A," by virtue of which the said William G. Brand has taken possession of, and still retains possession of, his said farm, mentioned in said contract or deed and referred to above, and also with the same design and by similar means obtained from this plaintiff, a bill of sale of all his personal property referred to above, by means of which the said William G. Brand has taken possession of, and still retains possession of, the personal property therein mentioned and referred to above ; and the plaintiff is unable to give a copy of said bill of sale, it being in the possession of said William G. Brand, the defendant, and he refusing to give said plaintiff a copy. That the said William G. Brand obtained the bill of sale of the said personal property, by falsely and fraudulently representing that it was only an instrument to keep one George Brand, a brother of the defendant William G. Brand, from claiming pay for the use of such personal property from the said William G. Brand, the defendant, in case of the death of this plaintiff; and when this plaintiff signed the said bill of sale, he had no knowledge that he was dispossessing himself of title to said personal property, and did not intend to convey the title away to the said William G. Brand That the same was not read to him before he signed it, and he did not know its contents except as they were represented to him by the said defendant, William G. Baand ; and that he signed the same under an entire misapprehension of the contents thereof, constrained and deceived by the undue control and influence of the said William G. Brand.

That the said William G. Brand paid no consideration to this plaintiff either for the said land or the said personal property, but executed a mortgage without a bond back to this said plaintiff on half of said farm, payable without interest, one year after plaintiff's death, falsely representing to this plaintiff, that he would be compelled to pay the older son of plaintiff, the said George Brand, the full amount of said mortgage, and that by thus representing to said plaintiff that his son George would get the full $1400, within a year from his, said plaintiff's death, and by urging him to give said deed at once, this plaintiff signed and executed the same, thereby disinheriting his son George nearly, which this plaintiff did not intend nor design to do.

That before the commencement of this action, the plaintiff tendered to said defendant William G. Brand, a satisfaction of said mortgage, duly executed and acknowledged, and demanded of said defendants a re-conveyance of the said farm before mentioned, and the bill of sale of said personal property before mentioned, which the said defendant William G. Brand declined to give.

Wherefore, the said plaintiff prays that the defendants be decreed to re-convey to said plaintiff the said farm, and deliver to him the said bill of sale, or that the said deed given by said plaintiff to said William G. Brand, and the said bill of sale

Brand agt. Brand.

be adjudged null and void, and the said deed be canceled of record, or for such other and further relief as to the court may seem just.

FULLER & BARTLETT,
*Plaintiff's Attorneys.*

*State of New York, Onondaga County, ss. :*

Ira C. Brand of said county, being duly sworn, says : that he has heard the foregoing complaint read, and knows its contents, and that the same are true of his own knowledge, except as to matters therein stated on information and belief, and as to those matters he believes it to be true.

His
IRA C. X BRAND,
Mark.

Sworn to before me this 13th day of February, 1868.
H. RIEGEL, *County Judge.*

Witness, T. K. FULLER.

"A."

$6.00 U. S. Int. Rev., Canceled.

THIS INDENTURE, made this twenty-ninth day of January, in the year of our Lord, one thousand eight hundred and sixty-eight, between Ira C. Brand, of the town of Geddes, in the county of Onondaga, and state of New York, of the first part, and William G. Brand of the same place, of the second part.

*Witnesseth,* That the said party of the first part, in consideration of the sum of five thousand six hundred and thirty-six dollars, to him duly paid, hath sold, and by these presents doth grant and convey to the said party of the second part, his heirs and assigns, all that certain piece or parcel of land situate, lying and being in the town of Geddes, in the county of Onondaga, and state of New York, and is known and distinguished as farm lot number twelve, in the Onondaga Salt Springs Reservation, and is bounded and described in the field book of said reservation, made by John Randall, jr., on file in the office of the secretary of state, at the city of Albany, N .Y., and is bounded and described as follows, to wit :—Beginning at a stake in the southeast corner of lot No. 9, standing on the westerly shore of the Onandaga Lake, standing two links southerly of an elm tree marked 9, 12. and running thence along the southerly bounds thereof, south, sixty-two degrees west, thirty-eight chains and eighty-three links to a stake in the north-east corner of lot No. 11, standing sixteen links north, seventy-one degrees east, of a maple tree marked 11, 12 ; thence along the east bounds thereof south, twenty-eight degrees east, twenty chains and sixteen links to a stake in the southeast corner thereof, standing sixteen links north, seventy-eight degrees west, of a small maple tree marked 11, 12, 13, 14 ; thence north, sixty-two degrees east, thirty one chains and eighty links to an elm tree marked 12, 13, standing on the westerly shore of the Onondaga Lake ; and thence northerly along the same to the place of beginning, containing seventy-three acres, excepting the right in two and 58-100ths acres, as conveyed to the Oswego Railroad Company ; also subject to the conditions and reservations contained in the original patent of said land ; also subject to the payment of a mortgage on one half said land, of one thousand dollars and interest, to Irving Brand, which said party of the second part is to pay ; and also subject to the payment of fourteen hundred dollars—said fourteen hundred dollars to be paid to George S. Brand, one year after the death of said Ira G. Brand, according to a mortgage given therefor ; and also subject to the support and maintenance of the party of the first part during his natural life in a comfortable and suitable manner, or of the payment of the said party of the first part, each and every year, of the sum of two hundred and twenty-

Brand agt. Brand.

five dollars, in equal quarterly payments from the first day of January, 1868, during his natural life. The party of the first part hereby reserves the crop of wheat now growing on said farm, and the right to harvest the same, and also the house now occupied by said George S. Brand, and the right of said George S. Brand to remove the said house at any time within one year from this date, with the appurtenances, and all the estate, title and interest therein of the said party of the first part. And the said Ira C. Brand doth hereby covenant and agree to and with the said party of the second part, his heirs and assigns, that the premises thus conveyed in the quiet and peaceable possession of the said party of the second part, his heirs and assigns, he will forever warrant and defend against any person whomsoever lawfully claiming the same or any part thereof.

In witness whereof, the party of the first part hath hereunto set his hand and seal the day and year first above written.

His<br>IRA C. X BRAND.<br>Mark.

Sealed and delivered in the presence of
        IRVING G. VANN.

*State of New York, Onondaga County, ss.:*

On this twenty-ninth day of January, in the year one thousand eight hundred and sixty-eight, before me appeared Ira C. Brand, to me personally known to be the same person described in and who executed the foregoing instrument, and acknowledged that he executed the same.

R. RAYNOR. *Notary Public,*<br>*Syracuse, N. Y.*

Recorded January 29, 1868, at 4 P. M.
        THEO. L. POOLE, *Clerk.*
            *(Book of Deeds, No. 168, p., 418, &c.)*

*State of New York, Onondaga County, clerk's office, ss.:*

5c. Int. Rev. Canceled.

I do hereby certify, that I have compared the foregoing copy of a deed with the original record thereof now remaining in this office ; and that the same is a correct transcript therefrom, and of the whole of such original record.

In testimony whereof, I have hereunto set my hand and affixed my seal of [L.S.] office at the city of Syracuse, this 15th day of February, 1868.

THEO. L. POOLE, *Clerk.*

---

*(Title of cause.)*                    ANSWER.

The defendant, William G. Brand, impleaded, &c., as aforesaid, answering the complaint of the plaintiff in this action, denies the same, and each and every allegation therein contained, except that which is hereby expressly admitted ; and also except that plaintiff before the commencement of this action, tendered this defendant a satisfaction of the mortgage mentioned in said complaint, and demanded a re-conveyance of said farm and bill of sale of said personal property, and which this defendant declined to give ; that the above named plaintiff is nearly seventy-five years of age, and that for nearly thirty years last past he has resided in the town of Geddes, in said county ; that the defendant, Alida Brand, is the wife of this defendant, and is now living and cohabiting with him as such ; that on the 25th day of June last, the wife of said plaintiff departed this life ; that said plaintiff has two sons residing in said county of Onondaga ; that during the summer of 1867, the plaintiff continued to reside on his said farm, living wholly by himself during the

Brand agt. Brand.

most of the time, though during a short season with a house-keeper; that for ten years last past, it has been the intention of said plaintiff, often expressed to his family·and his neighbors, to bestow the greater part of his property upon this defendant; that while his wife was still living, and before this defendant removed to Wisconsin, the plaintiff wished this defendant to take the farm, and to thus relieve him, said plaintiff, of anxieties and cares unsuited to his time of life; that immediately after the death of plaintiff's wife, said request of plaintiff was still more urgently renewed, and he entreated this defendant to return and take the farm and take care of his father in his old age, and protect his property from waste, and his person from insult and threats and dangers of violence at the hands of his other son; that this defendant declined these offers, one and all, preferring to remain on his farm in Wisconsin, where his prospects were promising; that at last, however, the entreaties of plaintiff became so urgent and importunate that this defendant, at great personal inconvenience and at great pecuniary sacrifice and loss, yielded to the solicitations of said plaintiff and consented to take the farm; that he arranged his affairs in Wisconsin, came east to plaintiff's home, and in anticipation of taking care of plaintiiff in a comfortable manner, and one suited to the wants of old age, this defendant married the other defendant in this action; that the transfer of plaintiff's farm to this defendant, and all the details thereof, were long and well considered by plaintiff, and talked over by him with his acquaintances and friends, and that said deed and bill of sale mentioned in ·the complaint herein, were drawn up in the presence of plaintiff and at his suggestion and dictation, and without any interference or undue influence exercised or attempted to be exercised by this defendant, or by any other person or persons; that both of said instruments were carefully read over to said plaintiff before their execution, and the details thereof explained to him, and such alterations made as he directed; and he then freely and of his own volition, and without the slightest compulsion, influence, or even suggestion of any one, signed, acknowledged and delivered the same to this defendant, and expressed himself pleased at being thus relieved of cares which had long annoyed him; that it was then and there understood and agreed by and between the plaintiff and this defendant that the said deed and bill of sale were a setttlement and advancement to this defendant of his share of plaintiff's estate; that said mortgage was executed and delivered by this defendant to plaintiff to secure him a support during his life, and further, because it was requested by plaintiff so to be done, in order that he might dispose of that and some $600 in money in the bank, and other personal property belonging to·him, by will, to the children of his son George, so that his family might not be deprived of the avails thereof by his, said George, improvidence and mismanagement; that the execution of said deed and bill of sale by plaintiff to this defendant, was an· advancement to him long in contemplation, deliberately executed, and with a full knowledge of all the facts and circumstances relating thereto, and that the same were accepted by this defendant in equal good faith, and with the fair and *bona fide* intention on the part of this defendant of carrying out the wishes of the said plaintiff; that since said transfer, the plaintiff has been provided and cared for according to said agreement, and he is now living with this defendant and his family.

Wherefore this defendant, impleaded, &c., as aforesaid, asks that the complaint of the Plaintiff be dismissed with costs.

RAYNOR & VANN,
*Attorneys for said defendant, impleaded, &c.*

*Onondaga County, ss. :*

William G. Brand, of the town of Geddes, in said county, being duly sworn, says: That he is the above named defendant, impleaded, &c., as aforesaid; that

Brand agt. Brand.

he has read the foregoing answer, and knows the contents thereof, and that the same is true of his own knowledge, except as to the matters therein stated on information and belief, and as to those matters he believes it to be true.

WILLIAM G. BRAND.

Subscribed and sworn to before me on this 27th day of March, 1868.

C. A. HURD,

*Notary Public, Syracuse.*

*(Title of cause.)*

THE issues in this action having been duly referred to the Hon LE ROY MORGAN, sole referee, to hear and determine the same, came on for trial before him, at his office, on the 8th day of September, 1868, whereat the following proceedings were had:—

IRA C. BRAND, *the plaintiff, being duly sworn, says:*

I am plaintiff; the defendants are my son and his wife; I reside on the old homestead in Geddes, and have for over forty years; I am in my seventy-sixth year; I have but two children living; George, the elder, and William, the defendant; my wife died on the 15th of June, 1867; my health has been poor since she died; I have four grandchildren only—the children of George; when my wife died, William lived in Wisconsin, and George lived on the north part of my farm;. I lived in my house by myself; William would have been west two years if he had stayed until last May; I sent for William to come down he came in July and stayed one week; he returned, and came again in November, 1867, and stayed: William worked for me a number of years before he went west, and was paid by selling the crops and keeping the money; he and his mother had all the money; when he last went away, a thousand dollars was borrowed by mortgaging the north half of the farm, which George lived on, and paid to William; soon after William came back in November, he wanted a deed of the whole farm; I offered to hire him by the month, and he wouldn't hire; then I offered to let him the farm on shares; he wouldn't take it. but wanted a deed of the whole; at first I stood out and wouldn't give it to him; I stood out until I was overpowered; I said I did not want to give a deed of the whole, and then he fetched up what George would do; he told me that George would misuse me, and get everything I had, and squander it; I told him I would give him a deed of one half of the farm, if that would end the story; No! he would have a deed of the whole, he said; I told him he was most too sharp for me; then I told him I would give him a deed of one third, George a deed of one third, and keep a third myself, if that would do; No! he wouldn't do that; he wanted a deed of the whole so that he could shut George off; he said that he could not live by the side of George, and would not; he wanted a deed of the whole; he would not take any of my offers, and then I was going to back out; William told me I was as slow as a hill of potatoes in the winter; he wanted the deed right along; at this time he lived with me; I boarded him: I had him and Mrs. Peeler in my family; George lived some thirty or forty rods from me; some days I saw George, and some days not; William said if I didn't give him the deed, he would leave, and George and I might go to Tophet together; he told me he wouldn't have come near me but for the property: of course I wanted to keep him, but did not want to give him all I had; he first brought me down to Syracuse some time in January, I think; can't tell the exact time, I was so unwell and out of fix, he talked to me so much; he would get me excited some days and nerved up so I didn't know what I was about: I was feeling so, I can't remember exactly when it was we first came down.

Brand agt. Brand.

[The first deed, made and dated January 22, 1868, introduced in evidence, marked Exhibit "A," is substantially the same as the second deed given, except as to the $1,400, to which reference may be had.]

William brought me down and I executed this deed; I was dissatisfied with it, and I came back and took it up; William wouldn't give me anything to show for my support; and after I came and took up the first deed, William was mad and scolded me till[ I] was [about scared into] the second one; he said over[ and over again that he would leave me if he couldn,t have control of the whole, and I told him I would make a will, and will each one what I thought he ought to have; he said no, a deed is stronger than a will, and that George would break up a will; he brought me down to Raynors's office a few days after the first deed was given; Raynor said, divide the property between the boys and let each one support you half; I told him I couldn't do that, because William said he must have the whole; William did not hear our talk.

[Second deed introduced in evidence, and reads as follows:—] *(See deed in the complaint.)*

None of the consideration named in said deed was paid to me; I received no money from William either for the farm or the personal property.

[The mortgage of $1,400, from William to his father, was here introduced in evidence, and reads as follows:—]

$1.50 U. S. Int. Rev. Stamp, canceled.

THIS INDENTURE, made this twenty-ninth day of January, one thousand eight hundred and sixty-eight, between William G. Brand, of the town of Geddes, county of Onondaga, and state of New York, of the first part, and Ira C. Brand, of the same place, of the second part,

*Witnesseth*, that the said party of the first part, in consideration of the sum of fourteen hundred dollars, to him duly paid, hath granted bargained, sold, conveyed and by these presents doth grant, bargain, sell, and convey to the said party of the second part, his heirs and assigns forever, all the north half of that certain piece or parcel of land situate, lying and being in the town of Geddes, in said county and state, and is known and distinguished as farm lot, No. 12, in the Onondaga Salt Springs Reservation, and is bounded and described as follows, in the Field Book of said Reservation, made by John Randall, Jr., on file in the office of the Secretary of State, in the city of Albany, N. Y.; and is bounded and described as follows, to wit: Beginning at a stake in the southeast corner of Lot No. 9, standing on the westerly shore of Onondaga Lake, standing two links southerly of an elm tree, marked 9, 12, and running thence along the southerly bounds thereof south 62 degrees west, 38 chains and 83 links, to a stake in the northeast corner of Lot No. 11, standing 16 links north, 71 degrees east of a maple tree marked 11, 12; thence along the east bounds thereof south 28 degrees east, 20 chains and 16 links, to a stake in the southeast corner thereof, standing 16 links north, 78 degrees west of a small maple tree, 11, 12, 13, 14; thence north 82 degrees east, 31 chains and 80 links to an elm tree marked 12 13, standing on the westerly shore of the Onondaga Lake, and thence northerly along the same to the place of beginning, containing thirty-six and one half (36½) acres, being the same premises this day conveyed by Ira C. Brand to William G. Brand, with the appurtenances, and all the estate, title and interest, of the said party of the first part therein, to have and to hold the same to the said party of the second part, his heirs and assigns, forever: *Provided*, always and these presents are on this express condition, that if the said William G. Brand, party of the first part, heirs, executors. or administrators, shall well and truly pay,

or cause to be paid. to the party of the second part, or his certain attorney, heirs, executors, administrators or assigns, the sum of fourteen hundred dollars. in one year from the death of the said party of the second part; and also subject to the support and maintenance of the party of the second part, during his natural life, in a comfortable and suitable manner, or for the payment to the said party of the second part, of $225. in quarterly payments, from January 1st, 1868, during the natural life of the said party of the second part, which said sums and conditions herein named, the said William G. Brand hereby covenants to pay and perform, and when paid thus and so performed, then these presents shall cease and be void; and in case default shall be made in the payment of the principal sum hereby intended to be secured, or the conditions hereby to be performed, or in the payment of thereof, or any part of such principal, or of any of the above conditions, as above provided, then the said party of the second part, his executors, administrators, or assigns, are hereby authorized, pursuant to statute, to sell the premises above granted, or so much thereof as will be necessary to satisfy the amount then due, and the performance of the above conditions, with the costs and expenses allowed by law, rendering the overplus, if any there may be, to the said William G. Brand, heirs, executors administrators, or assigns.

In witness whereof, the said party of the first part, hath hereunto set his hand and seal the day and seal the day and year first above written.

WILLIAM G. BRAND. [L. S.]

Sealed and delivered in the presence of— The words: "And conditions herein named," "And perform, and when paid thus and so performed;" "Or the conditions hereby to be performed;" and, "Or any of the above conditions," were all interlined before signing; also the words, "and the performance of the above conditions;" and the two last lines on the second page, were erased before signing.

WILLIAM G. BRAND.

*State of New York, Onondaga County, ss.:*

On this twenty-ninth day of January, in the year one thousand eight hundred and sixty-eight, before me appeared William G. Brand, to me personally known to be the same person described in and who executed the foregoing instrument, and acknowledged that he executed the same.

R. RAYNOR, *Notary Public,*
*Syracuse, N. Y.*

Recorded January 29th, 1868, at 4 P. M., in Book No. 124, page 261, &c.
THEO. L. POOLE, *Clerk.*

*State of New York, Onondaga County Clerk's Office, ss.:*

I do hereby certify that I have compared the foregoing copy of a mortgage, with the original record thereof, now remaining in this office; and that the same is a correct transcript therefrom, and of the whole of such original record.

In testimony whereof, I have hereunto set my hand and affixed my
[L. S.]      seal of office, at the city of Syracuse, this 27th day of June, 1868.
THEO. L. POOLE, *Clerk.*

5 cent Int. Rev. Stamp, canceled.

[The one thousand dollar mortgage given by Ira C. Brand to Irving C. Brand, dated May 4, 1866, and covering only the north half of said farm, was here put in evidence and marked Exhibit "D." to which either party may refer on the argument].

*Witness.*—The north half of the farm is worth over $100 per acre; the farm contains about 71½ acres, and is worth $100 per acre; I was offered $150 an acre for

five acres, the balance was worth $100 per acre; I had a sleigh and wagon, plow, harness, two horses, hens, and drags, four head of cattle, three hogs, hay and grain; I told William I should hang on to the personal property anyway; then he wanted some paper to keep George from sueing him for the use of it, after I was dead; I asked Raynor if he had got that thing up to keep George off, and he said yes; he brought it to me and I signed it; I didn't know what it was; George was not there; I sat back and didn't say much; Willie would put in before I had a chance; William wouldn't sign any mortgage to me until I signed the paper to keep George off.

[Bill of sale here introduced in evidence from the plaintiff to William, conveying one pair of horses, three cows, one yearling heifer, drags, plows, and two pigs].

*Witness.*—I cannot read writing; the horses were worth $300; the harness was worth $30 to $40; the wagon $60; the sleigh $15 to 20; the cows $235; the heifer $30; the drag $30; the plow $7; and the pigs $24, making in all about $641; after I got home I said I would sell one of the cows, and William told me I couldn't that he had a bill of sale of the personal property; I had told them at Raynor's office, that I would not let William have the personal property; then Raynor advised William to buy the personal property, and William did not make much reply; I offered to sell it to him, but he wouldn't buy it; then I offered to give him the use of it for one year, and then he wanted the writing got up to keep George from making him pay for the use of it; the horses, cows and hogs, have been fed since on my own hay and grain; what provisions I had on hand have been used in the family, and are not all gone yet; I have lived in the same house with William since his return in November last; in a week or two after, I offered William $600 to let me off, and he offered to let me off for $1,000; the more I tried to buy him off the higher price he would ask; he offered to let me off once for $600, and when I got ready to give that, he wanted $1,000, and I couldn't give it; I heard something about the mortgage; I suppose it was to secure George $1,400, and I understood that it was to secure my support; and if I was compelled to leave and couldn't stand it any longer, I was to have $225 toward my support; I told William that was not enough, but he said he wouldn't give me any more; so that was the end of that story.

[The plaintiff at this point offers to show how he has been treated by William since the deed was given, which evidence was objected to by defendant's counsel, and excluded by the referee].

To which ruling the plaintiff excepted.

*Cross-examination.*—George is upwards of forty years of age, and William is two years younger; John died twenty years ago, when he was only twenty-four years old; he left no children; my only heirs are George and William; William worked for me on the farm and had his pay for it; he was twenty-five years old when he first left and went to Michigan; he was gone three years, and a part of that time George worked the farm on shares; when William first went away he pretended that I owed him $1,600; he had about $400 and a note of $1,000; I was not wholly satisfied with the way George managed, and complained to the neighbors about it; I hired William when he came back from Michigan; I paid him very near $300 a year in all; he told me he could not work for less than $180 a year; he worked for me about six years after he returned from Michigan; I gave him a mortgage for $1,000, but can't tell when I gave it to him; I took up this mortgage by the money on another to Irving Brand; William went out west about the time it was given to Irving Brand; I didn't see him again until in July, 1867; I was sick abed, and Mr. Wolf was with me; George was working the farm on shares at the time; I

Brand agt. Brand.

gave him one half of the crops; George worked the farm when William was away, except what I kept for myself; I raised wheat in 1866, and 1867, and it was all put into the granary—George's part in one place and mine in another, by itself; I know Mr. Townsend; he lived thirty or forty rods from me; I told him when he was writing to William to tell him to come down because I was sick; I did not tell him to tell William that I would send him money to come with, as I remember of; I did not tell Townsend to write William that George had stolen my wife's bank book, and I could not get it; William came down in July; he said that he owned a farm in Wisconsin of 160 acres; he did not marry at my request; he stayed a week in July; I told him I would like to have him come back; he said he would sell his things and come; he offered to come, and I said I wished he would; I didn't tell him he should be well paid; he said he would come back in November; he came, and has been here ever since; he was not married when he came back; Mrs. Peeler kept house for me and did my washing and mending; she stayed until Williams' wife came; I think he got married in January; I tried to hire Willie, and he said he wouldn't work by the month or on shares; he said he wanted a deed; he said he sold off his stuff and horses, and that was enough to pay for his farm; he didn't tell me he couldn't afford to sell out up west and work for me by the month or on shares; I know nothing about his marriage; I had nothing to do with it; he didn't tell me we couldn't get any respectable girl to come and keep house for us, and so he must get married; I did not know he was going to get married; I didn't tell him I wanted him to get a good wife who would take good care of me; I saw the woman he married some seven or eight years ago; I have lived in the old homestead with them, but out of my own provisions; all the furniture and things in the house belong to me; he hadn't been back over a week before he wanted a deed; I didn't want to give it; then he wanted to know what chance I was going to give him; I told him I would let him work the farm on shares; he said he wouldn't; he wanted a deed of the whole wriggling, so he could root George off; I told him I shouldn't be contented to deed away the farm; he said he must have a deed or he wouldn't stay, and then fetched up about George—what he would do; he kept saying he would go away if he couldn't have a deed of the whole, and I don't know what I replied every time; I can't remember; I didn't agree to give him the deed; I can't point out the day or the week of these conversations; I know I wanted to give him a deed of one third, George one third, and keep a third myself; he said he must have a deed of the whole anyway; I was so nerved up I couldn't remember of all that was said; I can't remember much, only he stuck me for the deed; I havn't told any neighbors that I was going to give Willie John's share; I never told Mr. Remington so; Willie told me that George would break a will; I proposed to make a will, and Willie wanted two thirds of the land; Mr. Raynor told me once he never saw a man have so much influence over another as Willie had over me; I was alone when he told me; I went down with Willie and had the first deed drawn; George went with me when I took it up; I did it because I was dissatisfied, and Willie wouldn't give me anything back; Raynor read this first deed to me; I didn't say that I changed the $1,500 to $1,400, because George put me to the trouble to make another deed; George is worth nothing that I bnow of; I paid a note for him, but I hold his note for it; I said I ought to have the money paid to George's children; I didn't tell Townsend I'd rather Willie would get George off than do it myself; I had about $600 in the savings bank, and Willie wanted me to put that to his credit.

[The plaintiff here introduced in evidence a mortgage from plaintiff to defendant William, dated April 16, 1857, of $1,068, on the north half of plaintiff's farm, re-

corded in the book of mortgages, page 367, which may be referred to on the argument by either party].

Said mortgage was canceled May 19, 1866, in the book 118 of mortgages, page 13, Exhibit "F."

*Witness.*—This mortgage was paid and canceled when the $1,000 mortgage was given; Willie went and got the paper and signed it; I was told by some one that a pill would be made for me; Dr. Porter doctored me when I was sick; Willie put the amount in the last mortgage just as he had a mind to; I had no more to say about it than a yellow dog; I didn't go to George's because he had a large family; and, besides, I didn't want to leave my old house.

GEORGE S. BRAND, *sworn for plaintiff, says:*

I reside in the town of Geddes, on the north half of my father's farm; I erected the house in which I reside, and built it there at the request of my parents; I built part of it in 1848, and the balance about eight years ago; I have lived there since I first built; I have four children; William worked at home five years after he was one-and-twenty; the first mortgage was made when he left; he then went to Michigan and was gone about three years; then came back and hired out to father by the year; he then said he wanted the old folks to make a disposition of their property so he could know what he was going to have; he then wanted they should give him two-thirds of the land, and me one third, and they refused to do it, and he hired out to them; he worked in all about six years, and then went to Wisconsin; he was gone two years; while working at home he told me he had a power of attorney to do as he was a mind to—to buy and sell and anything else he chose; I asked him what that was for, and he said that father was not capable of doing business, and would go to the poorhouse if he didn't have some one to manage the property for him; there wasn't much said about the property when William left, only he said he wanted a deed of the farm, and wouldn't work by the year any longer; after I had taken the farm, he came out and said he did not know but he should take it yet; he didn't know but he should buy it; that was the main part of the conversation; he soon went off; at his departure I worked the farm for two years, and did not stop until William stopped me by an injunction; father has been feeble and declining since mother's death; I procured physician and medicines for him; he was sick abed when William came back; father did not manage the farm when William was there; William bought and sold the property, and when he was away mother did it: when I sold grain or anything, I always paid the proceeds to mother; when any one came to the house she made the bargains; father went to Albany eight or ten years ago to be appointed door-keeper of the assembly; this thing was got up for a joke, I suppose; Luther Hay drew the petition, and father got signers to it and went to get his appointment; he was gone about two weeks before he came back; he went alone; William was married before the deed was given; I never heard any talk between father and William about giving the deed, and did not know of it until after the first deed was given; I first heard of that the morning after it was given; father came to the barn and said he didn't sleep any the night before; I asked him what was the matter; he said he had given William a deed of the farm and it worried him; I asked him why he did it, and he said Willie kept a dinging at him for it, and wouldn't give him any peace, night or day, until he got it; I asked him where the deed was, and he said at Raynor's office; he said he wanted to get it, and I told him I would bring him down to get it if he wanted me to; he said he did if he could get away and not let Willie know it, and I brought him; when we got to Syracuse we went to Raynor's office, got the deed and he had his name crossed off;

that morning he acted troubled; it was about eight o'clock when he told me at the barn, and we started about half-past eight; father walked to my house while I was harnessing, and got in there; I don't know whether Willie knew of our coming or not; in about a week or ten days after the first deed, father told me he had given him another deed; he began by asking me what a bill of sale was.

[*Adjourned to October* 15, 1868, 10 *a. m.*]

The further examination of George S. Brand, suspended until after election.

HON. GEORGE GEDDES, *sworn for plaintiff, says :*

I reside in the town of Camillus, about four miles from plaintiff's; have known plaintiff forty to forty-five years; in the summer of 1846 I had charge of laying out the Oswego Railroad, and made my head-quarters at plaintiff's; the company bought the right of way through his farm; I negotiated the purchase, and nearly all my talk was with plaintiff's wife, though he was there; he was ready to sign papers when the old lady said so; Mr. Brand would set by and say but little, more than to acquiesce in what the old lady said, and the boys; have known him since that time till the present; while stopping at his house he took me up stairs to show me a machine he was getting up to run locomotives with, I think he said; he said it was to be a great machine, and exhibited his model; he wound it up and let it run down in my presence; I suggested some difficulties which he did not receive very well; he seemed to think the more wheels he got into it the more power he would get; he had strange notions in mechanism—some new to the world, I think; I don't think the plaintiff was ever sound in his mind since I have known him; I think him a man of inferior mind, and that badly shattered by bad habits; he seems to be to-day weak, as he always was; a good while afterwards he came to me to get money to go on with his machine; he seemed to think if he could get more money and more wheels, it would surely go; I asked him why he did not take his own money, and he said his folks would not let him have it; I told him his folks were right about it, when he flew into a great rage, and went out of the yard, brandishing his cane right and left in fearful style; I should not buy a cow or a pig of him at any time since I have known him unless some one was present to look after his interests, unless I did so myself; advantage could easily be taken of him; his intellect is very weak and his mind much below par, though I could not say that he was insane.

Q. Where any fear of difficulty might threaten him or his property, would he, in your judgment, be easily persuaded to do any act dictated by any person he considered a friend?

Objected to by defendant's counsel, and objection sustained.  Plaintiff excepts.

*Cross-examination.*—I have had no transactions with plaintiff within ten years last past, except his applying to me for money; I don't think he was in liquor when he called on me for money; his reputation used to be that of an intemperate man, but not of late years; he had been intemperate before 1846; while at his house that summer, I don't recollect seeing him in liquor; he talked with me about being made captain, and ordering the Liverpool fellows over into the woods; he said he told them they couldn't fight a squaw, unless they understood bush-fighting; he said he made them train on his farm; I heard of his being intemperate before that.

IRA C. BRAND, *recalled, testifies :*

William said George would get the property, and if I did not give him a deed pretty quick, George would get a guardian appointed over me.

Q. After you took the first deed from Mr. Raynor's office, what did William

say to you to hurry you up to give the second deed—*i. e.*, what did he say George would do?

*Defendant objects.*

*Objection overruled.*

Q. William said that if I did not give him a deed pretty soon, George would get a guardian appointed over me, and then I couldn't stir a peg, nor move any of my property; he told me George was going to do that.

The plaintiff offers to show by this witness that the defendant, William, dictated the amount named in the deed and mortgage, as *consideration*, and that the plaintiff was allowed no voice in settling those amounts.

The counsel for the defendant objects on the ground that that question had been gone into, and it was re-opening the case.

The objection sustained, and the plaintiff, by his counsel, duly excepted.

[*Adjourned to November* 30, 1868, 10 *a. m.*]

*The examination of* GEORGE S. BRAND *continued:*

*Witness.*—It was not over three days after the second deed was given, before I learned of it through father.

Q. State what your father said about it.

Objected to, and taken subject to objection.

A. First, he asked me what a bill of sale meant; he said he had given Willie a bill of sale of the personal property, and that Willie and Mr. Raynor had told him that it was only a paper to keep me from suing Willie for the use of the personal property after his death; he said he supposed he could sell the horses or cows just when he took a notion, or he shouldn't have given it; he said he told Willie he was going to sell a cow, and Willie told him he hadn't got any to sell—they belonged to him; that Willie said he had a bill of sale of them; he said he thought there was something wrong, and he wanted me to come down to Raynor's with him and see what shape it was in; when I got ready to come, he came and said Willie would not let him go with me; that Willie told him if he came with me, I would get him into jail when we got here in the city, so he got Cowan to come with him; they came down on the cars, and I came with a team, and met father and Cowan at Raynor's office: father spoke to Raynor about it, and told him it was wrong—that he didn't understand it; he supposed it was only a paper to keep me off; Mr. Raynor told him he couldn't sell anything—that the bill of sale he gave William controlled the property; then father asked him what he could do about it; Raynor told father that he could get it all back again if there was a misunderstanding; that it was not lawful on account of the influence Willie exercised over him, and he could get it back by suit; he told father to ask Willie first to convey the property back to him; during this time I heard of the last deed; the personal property conveyed by that bill of sale, was worth about $600.

*Cross-examination.*—I am forty-two years old; I left home in my twentieth year, and was married in my twenty-first year; I have kept house ever since my marriage —first at Onandaga Hill, for about three months, then went to father's, and lived there about six months, part of the time eating at the same table; then I hired a house in the neighborhood of Ross Brand, about one fourth of a mile from father's, and lived there about a year; I did not have my support off the farm during this time; I went next to Mottville, and staid there about three months, and kept a boarding house there; thence to Van Buren on the Dolph farm, and staid there about six months; thence to where I now live, and have lived there ever since; I built the house myself by my father's consent; I got the timber on the farm; I bought most of the lumber, but got some on the farm; there is about one fourth of

an acre of land connected with the house I built; when I left father I left William at home; when I came back, William was still at home; he first went away in 1856 or '7, I guess—I can't be positive; up to that time he had lived at home; when he went away he said he went to Michigan; till *he* went away, I worked land on shares around; I did not work any of the farm; after he went away I worked father's farm on shares—at halves, under a verbal agreement, only; worked it on shares three years—till William came back; I settled with my mother, not with my father; she did the business; I settled with mother every year; divided the produce; settled in no other way; father knew about that; sold a good deal of her part and gave the money to her, none to father; I paid father nothing while I was on the farm; I never took receipts from mother when I paid her money; cut timber during that three years only for firewood—for no other purpose; sold no firewood; did not cut maple and beach wood and sell it while I was there, from the farm; my cow was pastured; I bought feed for my horse and cow during that three years; did not claim that father should pay me for keeping the horse and cow; did not have hard words with father during the three years I was there; no hard words at all during that time; do not not know that father used to find fault with my wife; never heard father and my wife quarrel; they don't speak or quarrel; I heard that they did not speak last summer sometime; father did not find fault to me about the way I conducted the farm; did not accuse me of not dividing the proceeds; heard he had talked to others of the neighbors; after William came from Michigan, he worked for five years on the farm; he said he came from Michigan to get a division of the property; don't know that father ever requested him to come; have sold my fifty acres— two years ago; had owned or managed the same, for fifteen years; I bought six shares of the ten shares in it, and managed the rest; we bought the whole farm—Mathewson and I, at referee's sale, ten years ago, or longer; I am not insolvent; I think I am worth $1,000 or more; father has signed with me, but paid no debts for me; I paid the note to Raynor—note $140; borrowed $100 of father; he signed other notes with me years ago, when I was at work on the farm; my first talk about property with William was before he went to Michigan; next, soon after he came back—at the barn; no one was by; he said he wanted a division, so he would know what he was going to have; he told over his plans—as to how we were to divide; I opposed it; Willie said set me off twenty acres; I said if I could not have half, I would not have any; he said he shouldn't stay unless he got a division someway; said he would not hire out to them; don't remember anything else said pertaining to that; we had conversations about the property after he had hired out to our folks; had a talk about the power of attorney; no one by; it was in the summer; he had been there I know not how long; William said he had a power of attorney, to buy and sell, and do the business as he was a mind to; I asked him what that was for, and he said tnat if the old man didn't have some one to do business for him he would go to the poor-house; he was going to have it so he could be boss himself; don't remember anything else; mother died one year ago last June; I lived on the farm, forty rods from father's; father continued to stay in the house where mother died after she died; he came to my house after mother died; I *hired* his washing done at first; *we* did no washing, but did baking for him —once at least that I know of; he first told me of his deed to William at the barn no one but him and me were there; I was harnessing about 8 a. m.: don't know where William was; fa'her first said ne didn't sleep any all night; I asked him what was the matter; he said he had given Willie a deed of the farm, and it wan't right—it worried him; I asked him what he did that for; he said because Willie kept dinging at him, and would give him no peace, night or day; I asked him where the deed was, and he said at Raynor's office; I told him he had better get it

and destroy it; he said he would if he could; I told him I would bring him down if he wanted to come; he said he wanted to come and get it, if he could get away and not let Willie know it; I told him I would fetch him down; he got ready and came to my house, and I brought him down; this was right away—soon as I could harness; Mr. Raynor or Vann handed him the deed when we got to their office; he did not leave the deed with Raynor after he told him to cross the name off; he carried the deed home with him; no one came with us; I advised father to destroy the deed, on the way down; he told me of a mortgage that was drawn up at Raynor's, and that Willie refused to sign it unless father would give him the $600 he had in the bank; Willie was there on the farm at this time; it was from a week to ten days from the first deed till I heard of the second deed; heard of the second deed at the barn; he *first* asked me what a bill of sale meant; he said he had given Willie another deed and a bill of sale, to keep me from sueing for the use of the personal property after the old man's death; did not come that day; he came down *after* a week or ten days; first saw father that day at Raynor's office; Cowan was with him; the first I heard, father said it was all wrong; said he did not know what a bill of sale meant; Raynor told him the bill of sale was a transfer to William, and he could not sell the personal property; he asked Raynor if he could not get it back, and Raynor said he could, on the ground of the undue influence of William over him; Raynor said if he asked the old man a question, Willie would reply for him, and it was all done according to Willie's directions; then Mr. Raynor advised him to ask Willie to re-convey, and if he would not, then he could bring an action, and the court would set the conveyance aside; father holds *my* note for the $100 I borrowed of him to pay Mr. Raynor.

*[Adjourned for dinner till 2 p. m.]*

Admitted that plaintiff tendered to defendants a deed to be executed by them, and demanded of the defendant William, a delivery up to plaintiff of the bill of sale, and tendered a satisfaction of the mortgage given by William to his father of the $1,400, payable to George one year after his father's death; also demanded a re-transfer of the personal property—all this before suit brought in this case, and defendant refused each request.

GEORGE S. BRAND *re-called by defendant*:

There is fifty acres of tillable land on the farm.

BENJAMIN COWAN, *sworn for plaintiff, says:*

I reside near plaintiff; have lived there eleven years; have known plaintiff all this time; the business on the farm was managed by William and all; George managed the most when William was away; William managed most when he was there; never had any business transactions with Ira C. Brand; recollect Ira C. Brand came to get me to come to Syracuse with him.

Q. State what was said by him to you at that time.

Objected to.

Objection overruled, and exception taken.

This was last winter when he came down to see about the bill of sale; he came and wanted to know if I knew what a bill of sale meant; he said he had been giving a deed of his farm to William, and a bill of sale of personal property, and he did not know what a bill of sale meant; said he spoke to William one day that he was going to sell one of the cows; William told him he hadn't got any cows to sell; he said he had given a bill of sale, and he wanted to see if that hindered him from selling—that is, the old man; he wanted me to come to Syracuse with him; I asked him why he didn't come with George; he said William told him that George

Brand agt. Brand.

wanted to get him down here to get him in jail; then I asked why he didn't come with William, and have Mr. Raynor explain it to him; he said he did not want to come with William; I came with him after being requested to by George; we went to Mr. Raynor's office when we came here; George came in after a little; the old man asked if he had no right to the personal property; Mr Raynor said not—the bill of sale conveyed the property all to William; Mr. Brand asked Raynor if he could not get it back in some way; Mr. Raynor told him there was no trouble in getting the personal property back; told him he was very foolish for giving it in the first place; then plaintiff said:—"I 'spose 1 couldn't get you to get it back for me?" Mr. Raynor said—"No, I am William's counsel."

*Cross-examination.*—Plaintiff came to my house two days or so before we came down; George came also at night, as we started down the next morning; had been in Raynor's office only a few minutes before George came in; the first I saw of him was there.

*AMASA BENNETT,* sworn for plaintiff, says :

I now reside in the town of Geddes, about a mile from plaintiff; I used to live nearer; have known plaintiff for twenty-five years; have worked considerable on the farm for them; have worked there while William was managing the farm; William hired and paid me for work, and had the principal management of the affairs there on the farm; I worked for him before he went to Wisconsin, and after; I heard William say that his father was not capable of doing business, and he did not allow him to do business; that was at a time when a note was given for a horse, by plaintiff; and they talked of taking steps to get rid of paying it; I think the farm was worth $100 per acre; can't tell how much was tillable, nor how much swamp; the house is not valuable, but the barns are good; I never owned a farm; it may have been eight or ten years ago that the old man drinked some; guess he has not drinked so much lately; can't tell how many acres of swamp land there is on it; the fences were about the same as on other farms; never owned, sold, or bought a farm.

*Plaintiff rests.*—With the privilege of calling Dr. Porter and Mrs. Peeler, who are absent.

The defendant moves to dismiss the complaint, on the ground that no cause of action had been shown by the evidence. 2. That no sufficient tender was made to rescind the contract. 3. That George and Irving Brand are necessary parties.

Motion denied, and exception taken.

WILLIAM G. BRAND, *defendant, sworn, says:*

Am defendant, and am forty years old; I worked for father till I was twenty-seven years old; I then went to Michigan; worked by the day and month; was there one year; came back to get a mortgage instead of a note; I staid and hired the farm for one year; paid $100 for the use of it; went then back to Michigan; staid three years; then came back and commenced to work for father, at *their* request; I worked under this agreement five years :—

"ARTICLES OF AGREEMENT made and entered into, this first day of February, 1860, by and between Ira C. Brand, of the town of Geddes, county of Onondaga, and state of New York, of the first part, and William G. Brand, of the same place, of the second part. *Witnesseth,* that the said party of the first part, hereby agrees to employ the said party of the second part, to work and labor for him on his farm, in the town of Geddes, upon which he now lives, for the space of five years from the date hereof, at and for the yearly compensation of one hundred and eighty dollars

per year (board and washing included,) payable at the close of each and every year.

"Said party of the second part, shall take and have the general and special charge of, and shall take and have the general and special management of the carrying on of said farm, and the exclusive control of all the business belonging to or in anywise appertaining to the management, control and carrying on of said farm for said term. The cultivation thereof, as well as the sale and disposition of all produce, of every name and nature, raised or grown therefrom during said term. The buying and selling of any stock or other personal property, which the said party of the second part, may at any time deem meet and proper. The said party of the second part shall, at the close of each and every year during said term, render unto the said party of the first part, a true and faithful account of all moneys had and received by him for or on account of any and all property so sold by him, and of all moneys paid out and expended by him for or on account of the said party of the first part, or his family; and the said party of the second part, hereby agrees to work and labor for the said party of the first part, for the term above specified, and at and for the yearly compensation above specified, and to keep, do, and perform, all the conditions of this contract above specified to be kept and performed on his part.

"In testimony whereof, the parties hereto have hereunto set their hands and seals, the day and year first above written.

"[L. S.]    WILLIAM G. BRAND.<br>
"[L. S.]    IRA C. BRAND."

I staid at home but one year longer; I hired to them in 1865 and '6, for $300 that year; I then went to Wisconsin; bought 160 acres of land; the farm had been cultivated twenty years; cost $18 per acre; bought team and tools; came back at father's request; I let the hay to cut; left team with a neighbor; mother died a month before I came; I found father sick, and Julius Wolf was there; a girl came next day; I was not married; father said he wanted me to come back and take care of him; I told him I came with the expectation of taking him back; I told him I was hiring my board in a family with five small children.

[ *Adjourned till Tuesday*—9 A. M.]

*Examination of* WILLIAM G. BRAND, *continued Tuesday morning at* 9½ A. M., *December* 1, 1868:

This conversation was in July; he said he didn't want to go; he had worked hard to improve the farm and make it a home, and he wanted to stay there while he lived; I asked him then if he calculated to keep George there; he said he did not; he said he had been bothered by George long enough; he was murdering him by inches, and he could not stand it any longer; said he had got the money in the house belonging to mother, and her bank book, and would not give it up; and that George was selling butter, eggs, hens, and the like, and pocketing the money, and would not give him any of it, and that he had been bothered with George's cows long enough; I told him if he got rid of George, I would come back; I told him I had lived in a fuss long enough, I had gone one thousand miles to get out of it, and I wanted to keep out; *he said he could not get rid of George without going to law with him, and he was too old for that; said he could fix it so I could get rid of him, and wanted me to.*

[Admitted that plaintiff denies this statement.]

I told him I would come back if he fixed it in that way; he said as soon as he got able to ride he would get Townsend to bring him down, and would fix it; I told him I couldn't change my situation without great loss; I told him I had bought when things were high, and at that time the markets were low, and a bad time to

sell; he said I shouldn't lose anything; I told him if I came back it would be necessary for me to get married, as he couldn't get a decent girl to stay with two men,—George's wife would have a good deal to say about it; he said he wanted me to get married, but did not want me to get such a fillissy as George had got, no allusion made as to any person at that time; while I lived at home, father and George's family did not agree; after this arrangement I went west; I sold most of my personal property before my return in November; have since sold my farm; found father at home quite smart, with Mrs. Peeler; he said the Chapman girl in July staid till August; then married and left; he had been alone two months, nearly. Shortly after I returned, I asked him if he had made out the writings, as he talked in July; he said not; asked him what he was going to do about it; he said he wanted me to go on and work and pay the $1,000 mortgage then due, and after that I could have what I could make off the place; I told him that would not answer my purpose; I could not spend my time and money there on uncertainties; I wanted to draw writings, and have it so I would be secure; then he said he would make a will; I told him a will would be very uncertain—he could alter it any time he saw fit; I told him I couldn't go on and improve the place as was necessary, and to pay out my money to do it, without better security; he said then he would deed me half; I told him I could not leave my business with 150 acres improved land of my own, and come back here and try to make a living off 20 acres of improved land; I told him if I had anything to do with it at all, I wanted to have control of the whole; he said he would give me a deed of the whole, but he wanted to keep the personal property; I told him I could not afford to work and raise grain to keep cattle, hogs and hens, and whenever there was a pound of butter to sell, it was his, and he was to have the money; he said then he would give me the use of the personal property; I told him I wanted something to show that in case he should be taken away, George couldn't sue me for the use of the personal property; said he would fix it so he couldn't; I told him then I would buy the farm, and pay the $1,000 mortgage, and give George whatever he wanted him to have, and would take the personal property towards my loss and expenses getting here, and give him his support; he did not say what he wanted George to have; I came down to Syracuse once before the writings were drawn; about a week before the first deed was drawn; I went to the office of A. G. S. Allis, and had a talk with him, and thence to Mr. Raynor's; father talked with Raynor—how he thought of giving me a deed of the farm; Raynor asked why he did not divide it equally between the two; he said George had lived there quite a number of years, and had things as he needed; had his stock kept there, and fire-wood, and had received $300 in that way; said George left home under age, and had always been saucy and ugly, and wouldn't help him after he left home, and that he never meant that he should have half of it; he said I had staid at home and helped to improve the farm, and had been the means of making it what it was, and he always calculated I should have the most; and if mother died first, he calculated to live with me, and he wanted to fix it so he could do it; Raynor advised him to lease it to me; *father thought not;* nothing said then about the amount George was to have; we came down within a week, him and me, alone; nothing said in the interval about George's amount; that was on the way down the second time; I asked father how much he proposed to give George; he said $2,000; I told him he had always talked about giving him $1,000; he said he thought that was not enough; I told him I would rather he'd pay me something for my trouble and expense getting down here, and he should give me $1,500 for my portion, and give George the rest, and let him take care of him; he said it would be poor support he'd get at his hands; if he had it, he'd not keep it two years, and then he'd be out of house and

Brand agt. Brand.

home; said he wanted I should have it; I told him I would take it then, if he wanted I should; he explained about the $2,000; said he thought George had had $300, aud he held two notes of about $200 against him, and he'd give them up to George, and that would make $500; I assented to it, and we came to Raynor's, and the first deed was drawn; we stated the substance of our talk to Raynor, and he drew the deed; we had not time to get up the mortgage and bill of sale; we were to come down the next fair day; I heard of the first deed being destroyed; asked father why he did it; he said George told him I could take advantage of it—by getting it recorded before I executed the mortgage; I said: "You must be foolish to think I would take advantage of you"; soon after, he said he wanted me to come down before George had a chance to serve an order to show cause on him why a guardian should not be appointed for him; I had been informed of that; I told father I didn't want to have anything to do with it; had rather give $300 than to have anything more to do with it; that is, in a settlement, I would rather take $300 less than my actual damage; I refused to pay anything towards making the second papers; he said he would dock George $100 for his rascality in getting him to destroy the first deed; I told him, since George had acted so mean, I would not give up my interest in a note he had of mother's; he gave directions to Raynor to draw the papers; he asked what Raynor was to charge; he said $20; I advanced the money; Raynor asked what the personal property consisted of; I told him; hens were spoken of, father said he wanted the hens to keep them for himself; Raynor read the bill of sale to father; can't say that Raynor explained it.

Q. Was the old man told the effect of it?

A. No.

*It was talked of that I wanted this paper to keep George from sueing me after father's death;* don't remember the reply; he only spoke of keeping the hens; he said he wanted I should have the use of the personal property, and wanted me to be secure; *father had* $600 *in bank;* I heard of father's complaint about the bill of sale, from neighbors; he said to me he did not feel satisfied with it; I told him it gave me the control of the personal property; it gave me the power to hold it; he spoke about wanting it back; I told him I didn't want to give it up; can't say what reply he made; after suit was commenced, he wanted me to come with him to Fuller's office and have the suit stopped; he said I could blame George for it; he said he was entirely influenced by him; that he did not want to sue me; he told Fuller he wanted to stop it; Fuller told him when costs were paid he would stop the suit; he told Fuller, George was the one who used the undue influence, instead of me; he told Fuller he had not the money then, but would come in in a week and pay it; I sold wheat and gave him the money—$45; he told me Fuller charged too much, and he wouldn't pay it; he argued with Fuller to take less, and he wouldn't; I talked with the woman I married in Rochester; brought my wife home in January —the 7th, and have been keeping house ever since; father lived with us; I was 21 years of age in 1849; I did not hire out to father; I staid and worked six years before going away; I had not the management of the farm; father used to manage; used to buy and sell such property as necessary; *I received pay for that six years' labor;* I was paid $120 in money by Armstrong & Hudson; I had sold them a colt; and took their note; they paid that note to me, and I took a note of the old gentleman of $980, to run ten years, at simple interest; that was $1,100 paid for the six years; *I gave the note up to father,* and got a mortgage of $1,068 to run eight years, at simple interest; did not request father to make a disposition of his property; used no threats to get the mortgage; the contract under which I worked was the only authority I ever had; during the five years I did not exercise control, but worked subject to father's advice and counsel; I sold the grain; I kept all the

money received from the sale of produce until the end of the year; the settlement was with father and mother together; after the first year I had no settlement until the end of the contract; during the last four years I paid no money to father or mother; I bought father's clothes—such as was necessary; he never asked for money and I refused; never struck my father; I offered them to set some price for George's portion, and I would pay him the money, and they might take their choice of houses, and I would live in the other; it was my idea then for them to give me a deed of the whole farm; mother did not want to do so; wanted me to stay on by the month, and offered me $300 a year; nothing was said about a deed in July; I was here in July—one week and one day; father said in July, if I would come back he would fix it so that I would lose nothing; I came back on uncertainties; father had not drawn writings to the effect that I should have control; nothing was said as to what those writings should be; there has always been a strong enmity between George and myself, from childhood; my object was to make some arrangement by which George should be put off the farm altogether, if I was to stay there, for I wouldn't live near him; *I told father that George had always said he would break a will if he made one; that was one of the reasons I would not work under a will;* father proposed to deed me one third, George one third, and keep one third himself; that was not mentioned at Raynor's office; it was in July father told me he wanted me to oust George; we both talked in Raynor's office; Raynor advised him to make some other disposition of his property; the old gentleman said he didn't agree with Raynor; don't recollect that father said Willie would not be satisfied with any other arrangement; myself and father came to the office of Fuller to settle and stop the suit; I told father I would take six hundred dollars and give up the whole concern; don't recollect what Fuller said about the $600; father told me he thought $600 too much; I said that was less than I ought to have; father agreed finally to give me $600; three months afterwards, I asked him a thousand dollars; some of the provisions are there yet; I did not tell father I would not sign the mortgage until I got the $600; father was to sign the bill of sale about sundown; we remained at Raynor's office while the deed, mortgage, and bill of sale, were being drawn; father did not propose afterwards to sell off any stock; father never told me that he should hang on to the personal property.

*Suspended, to call* ELIZABETH WOLF, *sworn for defendant, says:*

I took care of old Mr Brand from the 10th July—after his wife's death; William was west; my husband boarded there; they were all the family; I was at George's house; Mrs. George Brand told me if I would put something into his food, she would fix it, and it would make him sick, and if he died, she would swear he died in a fit; I said I did not want to do it; I was married after being there five weeks; left him alone at that time; saw him alone afterwards.

*Cross-examination.*—At the time Mrs. Brand told me this, there were present—herself, husband, her three children and me; Mary Crum was not there at that time; this talk was not Sunday; when I first went to Mrs. Brand's, I used to stay there nights; was there only four nights; staid nights after that to old Mr. Brand's —Mr. Brand, my husband, and myself; we three were all the family; she spoke with me about putting something in the old man's food, twice; the second time there was no one in but her hired girl, Nettie Cooper; there were no children there then; Mary Crum was not there either time; Mrs. Brand's were at the old man's a good deal; the old man used to complain to me of their eating his cookies; did not tell Mrs. Brand about it; the first said, I told her I could not keep anything baked; I told her when I thought I had anything baked and went to get it, I didn't find it; I told Mrs. Brand that the old gentleman laid it to the children; the

victuals that I missed were cookies and cakes; she said if I would put some ipecac into the cookies, to make whoever eat them, sick, we could tell whether they were eaten by the children or some one else; that was all there was of it; Mrs. George Brand paid me for my services there.

*December 24, 1868—Cross-examination of* WILLIAM G. BRAND, *continued:*

I never talked property matters when George was by; talked sometimes in the presence of other persons, but generally when father and I were alone; could not name any person in whose presence we talked property matters; don't recollect that we talked of them in Mrs. Peeler's presence; Mrs. Peeler was at father's when I came back in November, and staid ten or eleven weeks; she went away, perhaps, a week before the first deed was given; my wife had come there when she went away; I had consulted counsel with reference to the property prior to the marriage; don't recollect that I was advised to marry before I took the deed; have paid no cash to father on the bill of sale or deed; it was the understanding that I was to have the use of the personal property on account of my expenses; that was the idea of the bill of sale.

*Re-direct.*—In January last, I considered the farm worth about $80 per acre; 4 cows, $40 apiece; the horses are old—one worth $100, and the other $90; plow worth $4.50; drag worth $8.

STEPHEN REMINGTON, *sworn for dejendant, says:*

I have resided near the Brand farm, twenty-six or twenty-seven years; been there most of the time; think the farm was worth $80 per acre one year ago; have known Mr. Ira Brand forty years; saw him last winter often; had no deal with him; had frequent talks when we met; don't think he talked business with me last winter; we have talked about this suit since it commenced; he said he was sorry he sued William; can't give all the conversation; I said to him it was a pity they couldn't have settled it up without law; he replied that he was sorry that he had sued William; don't think he said anything more about the suit; the only reason he said so, was that it made trouble, and he was sorry he sued him; before the transfer to William, and soon after the old lady died, I heard the old gentleman talk of his property several ttmes; he seemed for a while to be considerably stirred up in his mind; I heard him say, when William got back, he was going to have him skedaddle George off the place; he found some fault with George; he said George took some wheat and oats and sold them, and had not given him the money; never said more than that George was saucy; don't know that the old man ever complained about George using violence; he sold the property right away after his mother's death; heard him say William helped clear up the farm, and staid at home and helped pay for it; heard him say that; heard the old man say he intended William should have John's portion of the property; heard him say so at different times.

*Cross-examination.*—The last time was not long before William came back in November; it was all after William had been down in July; don't recollect any complaints of the old man about William.

Mrs. ANN FRY, *sworn for defendant says:*

Reside near Ira C. Brand; lived there seven years; have been well acquained with the old gentleman; he was often at my house about the time his wife died; heard him say he intended to get William back; he requested me to cook for him; I asked him why he did not get Mrs. George Brand; he said he did not like to eat anything cooked there; he spoke of the ipecac that she threatened to put in the cookies, and said he thought she would be willing to put him out of the way to get

his property; never called on to bake for him but that once; after he had given the deed to Willie, told me that he had sold right out to Willie, and that he hadn't anything now; don't know of George ever treating his father badly.

*Cross-examination.*—Reside only a short distance from Ira C. Brand; at the time he told me he had sold out to Willie, he complained that Willie had been too sharp for him; he wanted to reserve a piece of land to keep a horse and cow on, so that if he got married, he might have something for himself; he said Willie would not let him reserve it; this talk was a few days after he had deeded his property to Willie; he said there was a paper got up about the personal property that he did not understand; have heard him complain about Willie's selling his stuff, and keeping the money; these complaints are recent.

*Re-direct.*—After the first deed he called on me and said he had told George and others, that he thought Willie had been too sharp for him, yet he did not know but that he had better leave it as it was; he said Willie had gone to the city, and he wanted to get here first, and keep everything standing just as it was in Willie's hands; was afraid it would take the last dollar he had in the bank.

*Re-cross-examination.*—He said one was pulling him one way, and the other the other, and he scarcely knew what to do.

JOHN FRY, *sworn for defendant, says.*

Am husband of last witness, and have lived near Ira C. Brand for seven years, did work for the old gentleman about one year ago; I dug all his potatoes and husked all his corn; he hired me; dug the potatoes for six pence per bushel; he settled and paid me; I fixed some fence for him on the place; I bought vineger of him; made the bargain with the old gentleman; dug the potatoes one year ago last fall, and fixed the fence last spring; the old man said George was to blame; he only hoed his crops once; heard him say he would not let George have the farm any more; he'd let a stranger have it first.

*Cross-examination.*—I understood that George worked the farm on shares that year—1867.

IRVING BRAND, *sworn for defendant, says:*

I am forty-three years old; I reside at William G. Brand's, in the town of Geddes; have lived in Geddes since the 26th February last; previously resided in Van Buren; am acquainted with plaintiff; have always known him; have lived two or three miles from him; he has always been a farmer; he owned a farm where he lived; he has lived there twenty years, certain; he lost his wife about one year ago; has not been married since; his family consisted of wife and two sons—George S. and William G.; he had grand-children—the children of George S. Brand; the third son, who died, was not married; have been acquainted with the family for twenty years past; George S. Brand left home, I think, before he was one-and-twenty, and worked for some one else; don't know who he worked for; could not say whether it was one or two years before he was twenty-one; don't know whether he took his things away from home; don't recollect whether he went to school or not while absent; don't recollect of hearing the old gentleman complain about George going off and leaving him; don't recollect of hearing the old gentleman complain that George would not work when *at home*; have heard him say that William was a better worker than George; don't recollect of hearing him complain that George did not account for produce sold from the farm; think I have heard the old man say George did not treat him well; have *not* heard him complain that George's family did not treat him well; he has complained some three or four years past about George's management of the farm; don't recollect that he complained of George's not reporting sales; the most of his complaint was in regard to

Brand agt. Brand.

the work—that he did not do his work to suit him, that he did not do it in season, when it ought to be done; that he did not do it quite to suit him; I have heard him say that George had a pretty extravagant woman, and that she wore too good clothes, but no such complaint about George: he seemed to think more of William's management than of George's; have heard him speak of William's prudence and attention to business; William staid at home till twenty-one and worked for his father, also, after he was one-and-twenty—until he went west the first time; how long after he was twenty one before he went west, I cannot say; he came back and hired to his father for *five years*; he was gone west a year, certain; don't know but longer; think George lived where he does *now* at that time; George has lived on the farm several years; his house stands on the north part of the farm; there is a yard—railroad on one side, and the road on the other; between one quarter and one half acre is fenced off with the house; think he has lived there ten or fifteen years; George worked the farm while William was west—at least a part of it; William worked the five years out; William went west again about two years ago—after the five years were up, and bought his farm; he came back last fall, having been there about one and half years; I heard the old gentieman say that Willie was coming back; he did not say why; this was after he went back in July and before he came in the fall; William was not at the funeral of his mother; the old gentleman told me that he had got Townsend to write Willie to come home; the old gentleman staid in his own house after his wife died till Willie came; this house is about thirty or forty rods from George's house; George has a wife and four children; the old gentleman was there alone a spell; he told me he used to take flour to some of the neighbors, and they used to bake him bread, cakes and cookies; have not heard him say who did his washing or made his bed; he said he did not go to George's because he did not like George's wife; I heard him say that some one told him that George's wife and his hired girl had said something about a hop up pill; I don't know how long he lived without a housekeeper; this girl got married, and the old man had another housekeeper who was with him; the girl was there when William came down in July; her name was Chapman; he hid not go to live at George's at all, that I know of; George worked the farm last year; don't know how he worked; don't know what lay he had; the old mam complained that the corn was not hoed as soon as it ought to have been; heard some complaint about the fences; heard him complain about the crops not being put in well; the old gentleman has lived with William since William came back; William went right into the old man's house; William lived with the old gentleman until they made a bargain; they still live in the house together there; William was married about the 10th of January—last winter; they have all lived in the house together since that; during the five years William worked for the old man, George worked land on shares for other people, and made cidar in the fall of each year; heard the old man say what he intended to do with his property; he told me he meant to give John's share to Willie; John was a son who died twenty years ago; this was three or four years ago; the old man said George had his mother's bank book; did not say he gave it to him; said he thought Julius Wolf got the book and gave it to George; he told me this after she died; the credit, he said was over $150; said he had asked George for it a number of times, and didn't get it; he said that money ought to go towards paying her funeral charges; don't know of the old gentleman lending George money; I have done a little business with the old gentleman up to October last; he left some interest money in the savings bank for me; last fall, this was; he mentioned the interest to me before it was due; he wanted to know when it was due; I told him; don't know that I discovered that he was incompetent to transact this business; he has lately talked to me about his property; had one talk with him

in the corn-house, in the winter—before his conveyance to William; I advised him to keep his property in his own hands as long as he lived; this was at my house after the old lady's death.

*Cross-examination.*—George worked the farm on shares six or seven years ago; the old man directed the farm; William was to have $185 per year for five years; have heard William say that he had a power of attorney, to manage the old man's business during that five years; the old gentleman has been more feeble since the old lady died; I would judge that his mind was weak and vacillating since his wife died; William told me the reason he got the power of attorney, was that he wanted to be boss—make bargains, and manage things himself; he did manage and was boss, so far as I saw; in the corn-house talk, the old man said—"I don't know what to do; I'm in trouble; Willie is too sharp for me; he is sharper than I thought he was going to be;" he said Willie wanted everything, and did not want him to have anything at all; this was before the conveyance; he even wanted the money that I had in the bank; I heard Willie say, after he came back in the fall, that he should not stay unless he could get things to his notion; he said the old man wanted to give George a part of the land, and he (Willie) did not want it to go so: there wasn't enough of it for two of them to work; he also said he wanted the team and the farming tools; there is about seventy-one acres in the old man's farm; Willie's farm out west has been run out a good deal; William has a quick temper, and gets mad quick; Willie complained about the old gentleman to me; said he thought he was notional about a great many things; that was before the conveyance and during the five years that Willie was at work for him; the old gentleman has a kind of nervous debility, and his hands tremble so as to trouble him to get his victuals or tea to his mouth; I have noticed this trembling for two years; I think it grows worse on him; I think William's influence over the old man has been greater since the old lady died, than before; think his influence greater, because he expects to depend more on Willie; Willie told me he tried to make a bargain with reference to the property before he went west, and would have staid if he had succeeded; this was two years ago this spring; he said he wanted to get the farm someway into his possession; think he said he wanted to buy it; he said he thought he could make a trade with the old gentleman, but he couldn't with the old lady; Willie said that he wanted to get rid of George; George was then living in the house where he now does; this was after Willie came back last fall—in November; the farm was conveyed 29th January, 1868; Willie said George was not entitled to have half the farm, and he didn't mean he should have it; Willie said that several times since he worked there the five years; said he thought he had been more benefit to the property or farm, and to the old folks; he told me he got his pay for his five years' work; have heard the old gentleman complain about Willie selling his butter and eggs, and not giving him (the old man) the pay for them.

IRVING G. VANN, *sworn for defendant, says:*

Know parties; was a law partner of R. Raynor when the writings were drawn; remember the old gentleman coming to the office previous to the writings being made; William came with him; they both came for advice about the property; they came together and the old man broached the subject; they were there nearly all the afternoon, and part of the forenoon, I think.

Q. State what transpired?

Plaintiff raises preliminary objection to Vann's evidence, on the ground—

*1st.* That he was one of the attorneys of plaintiff at the time in question, and should not be called upon to disclose confidential or privileged communications between plaintiff and himself, as attorney and client.

Brand agt. Brand.

2*d.* That under the proof, Raynor & Vann, as attorneys and legal advisers of the plaintiff counseled him in reference to the proper disposition of his property, and received his (plaintiff's) communication in the confidential relation of attorney and client; hence cannot divulge his communications under his objection.

3*d.* That since the counsel was given to this plaintiff, said firm of Raynor & Vann, under the proof, have refused to act as counsel for plaintiff in this action to recover his property from his son, the defendant; and on his application to them to do so, prior to the commencement of this suit, they answered, in substance, that they could not do so for him, as they were counsel for the defendant, William; and subsequent to that time, plaintiff was obliged to seek and procure other counsel to commence this action in his, said plaintiff's behalf; hence, his former communications to them were privileged, and neither of them can give them in court under plaintiff's objection.

Objection overruled and exception. Suspended, and—

ARTHUR ROONEY, *sworn for defendant, says:*

Am acquainted with plaintiff; had a talk with him a fews days after his wife died; plaintiff wanted to know what I'd cut his grass for; said his grass wanted cutting; that George was working on his farm on shares, and the grass was suffering, and would go back into the ground before he could get it cut, unless he could get me to cut it; told him I would not cut it less than one dollar per acre; he said after he talked with George he'd let me know whether he wanted me to cut it or not; said no more to to me about it; said George and his family had abused him, choked and struck him, and he was going to get Willie to work the farm next year.

*Cross-examination.*—Heard him complain against William since; said he was sorry he'd sold his place to William; did not see the grass he wanted cut; it was in July—after the 4th.

IRVING G. VANN, *re-called:*

Objections renewed.

Plaintiff's objections in writing and marked with referee's signature, and dated as above.

Objection overruled and exception taken.

A. Old Mr. Brand spoke to Raynor and said he had come down to talk with him in relation to giving his place to William; William was present part of the time; am not sure that he was all the time.

Objections renewed, on the ground—that it appears from Vann's evidence, that plaintiff was the client of Raynor & Vann at the time of this talk.

Overruled —exception.

He said George treated him unkindly, and George's wife also; that George's wife had either attempted or threatened (don't know which,) to poison him; said that he had given George a great deal of money at different times, and he had ridden around the country and spent it in various ways, and had not staid at home and worked as William had; that George's wife was extravagant, and spent money; that William had been a good boy and staid at home and worked hard; that he wanted to give him the place and live with him; that he had it in mind a good while, and it was the old woman's intention before she died; that William had come from the west, and he wanted him to stay; he asked Raynor how it could be done; I think Raynor advised him to make a will, and there was considerable talk about the will that I do not remember; Raynor advised him to keep the property in his own hands, and spoke of instances where fathers had suffered by

Brand agt. Brand.

giving children property before they died; the old man spoke of giving William a deed; some one—don't know who—spoke about a mortgage or agreement for the old man's support; that is the substance of that talk; can't say that all this conversation occurred that day; Mr. Raynor, spoke to them afterwards about dividing the farm; he spoke about the difficulty between the two boys; he came down again with William about a week afterwards.

Q. Tell what took place on that occasion.

Objected to as before.

Overruled and exceptions.

A. Can't say who commenced the talk; it was addressed to Raynor; he said he had made up his mind to give a deed to William, and then there was talk about a mortgage to be given back for the old man's support, and a certain amount to be given to George; also a talk between father and son as to the amount he would need per week, and about the yearly income from the farm; there was a good deal of talk about the mortgage that I don't remember; it was chiefly as to the amount to be put into the mortgage; William and Raynor differed as to the amount the old man would need; Raynor thought it would take more than William; the old man said he did not want the mortgage given directly to George, but wanted to secure it in some way to George's children; Raynor drew a deed of the farm to William; I think the deed was executed, and I signed it as subscribing witness; I read the deed to him, and that afternoon sometime, it was executed; after I had read the deed to him, I asked him if he understood it, and he said he did; there was a mortgage drawn up at the same time and William refused to sign it until the personal property was turned out to him also; William said he did not want to stay there unless he had control of matters; the old man said he did not want to give a bill of sale of the personal property, and William refused to sign the mortgage; there was more said which I do not remember; the interview was of several hours; don't know whether $1,400 or $1,600, was to go to George; don't remember the amount agreed on; William and the old man wanted it less than Raynor; the deed executed was left with Raynor; they left here, and the mortgage was not executed; they talked of the amount of the personal property, and what it consisted of; Raynor made a memorandum; the old man and William differed as to the value of the personal, widely; William put the value lower than the old man; there was talk about money in bank—amount $600; the old man said he should keep that; William did not speak of it; Raynor called it out in trying to learn the old man's worth; the old man and George came down next morning to the office—quite early; the old man complained that William wanted too much the day before, and he wanted the deed; Mr. Raynor produced the deed and canceled the signature; the deed remained in the office a few days afterwards; George came and got the deed canceled; he came with William again about a week after.

Q. What took place then?

Objected to on the same ground as before. Overruled and exception.

A. The old man said he had decided to give William a deed and the personal property; William copied the deed or the description from the mortgage; I don't know which; there was a deed and mortgage—either the original or another; they both talked about the personal property, and Raynor took it down; they differed as to the value of the personal property; Raynor asked for the value, and one would set one value and the other another; Mr. Raynor drew a bill of sale as he took the items down; I read the deed and the bill of sale to the old man carefully and distinctly, as Mr. Raynor cautioned me to; I came around and sat between Mr. Raynor and the old gentleman as I read; after I read them he signed them, and I subscribed them both as witness; I asked him if he understood the deed and

Brand agt. Brand.

bill of sale, and he said he did; don't remember any particular caution from Raynor at this particular time; at the time Raynor took down the articles of personal property, William mentioned the hens; the old gentleman said he wanted the hens; William objected; said he did not want to stay there unless he had control of all; I thought it was all going to fall through with, on account of the hens; but the hens were finally omitted; that was all that I remember; we were not attorneys of William G. Brand until after this suit commenced, to my knowledge.

*Cross-examination.*—The old gentleman said on the second occasion, he intended to keep the personal property; not on the third, except as to the hens and other things, some of which were put in the bill of sale; there was a good deal of conveyancing done at the office of Raynor & Vann; Mr. Raynor was a notary public; it was a custom with Raynor to have me sign deeds and mortgages where the party could not write, or where it was his individual deed; frequently during these lengthy interviews, when Raynor asked the old man a question, William would chime in and answer for him; after the papers were delivered, the old man came with George to our office; can't say if it was before the commencement of suit; George asked me if his father could not get his property back; I told him it depended entirely upon what took place at home; I remember of handing George the first deed; think that the first deed was at our office when the second was drawn.

*Adjourned until Thursday, 3d December, 1868.*

IRVING G. VANN, *recalled on cross-examination:*

There were in all, three different consultations at our office, at which both William and his father were present most of the time; at the first time, William said little, if anything; at the second and third, both received counsel with reference to the conveyance of this property; don't remember who paid for the services.

*Re-direct*—Q. From what you saw and heard, did you think the old man capable of doing business?

Objected to as incompetent and inadmissible.

Objection overruled, and exception.

A. I thought him capable of doing business.

*Re-cross examination.*—1 heard him complain of being tired at these interviews.

*Defendants rest.*

The counsel for the plaintiff moves to strike out all the testimony of Irving G. Vann relating to the interviews had at the law office of "*Raynor and Vann,*" by and between the plaintiff, Ira C. Brand, the defendant, William G. Brand, and "Raynor & Vann"—except the first—on the grounds:

*First.* The evidence shows that both plaintiff and defendant, William G. Brand, asked and received legal advice from said firm of Raynor & Vann with reference to the conveyance of the property in question in this suit; and that having acted as counsel for both said parties in said interviews, the disclosures or statements made by either party, are privileged communications, and cannot be proved by the attorney as a witness on this trial, involving the transactions which took place at such interviews at the instance of one party, without the consent and under the objection of the other.

*Second.* Because the proof shows that Raynor & Vann were not the regular attorneys or legal advisers of either plaintiff, or defendant, William G. Brand, prior to the transactions out of which this action has arisen, and for the purposes of those transactions and the conveying of said property, they were employed and paid by both parties, the plaintiff and defendant, William, for their legal advice and services.

Brand agt. Brand.

*Third.* Plaintiff's counsel moves specially to strike out the evidence of Mr. Vann relative to the interview when the second deed, the mortgage and the bill of sale, were executed and delivered, on the ground—that the proof clearly shows, that enough had transpired to the knowledge of Raynor & Vann, and the defendant, William G. Brand. ( to wit: the destroying of the first deed by the plaintiff, for the reasons alleged,—the estrangement between the two brothers, William and George, the sons of the plaintiff; keeping the transactions secret from the knowledge of George, who was being, by said transactions, partially, if not wholly, disinherited by his father, the plaintiff, through the manifest influence of the defendant, William, over him,) to indicate that out of the transactions which then and there took place, a lawsuit would inevitably arise; and as they acted as counsel for both parties, the communications then and there made, were *privileged*, and cannot be given in evidence on this trial at the instance of one party and against the will of the other, by the persons who acted as such counsel.

*Fourth.* Because said Raynor & Vann are now attorneys of record for defendant, William G. Brand, in this action, and cannot avail themselves or their client, of the disclosures or statements made to them by plaintiff, at a time when they acted as *his* counsel, by their own testimony of such disclosures and statements given on the trial of this suit, which grew out of the very transactions they then and there advised and conducted.

The referee refused the motion, and the plaintiff's counsel then and there duly excepted, and because, &c.

Dated, *April* 21, 1869.            LE ROY MORGAN, *Referee.*

---

(*Title of cause.*)            REFEREE'S REPORT.

*To the supreme court of the state of New York:*

The issues in the above-entitled action having been duly referred to me, as sole referee, to hear and determine, and the said action having been tried before me, after hearing the proofs and allegations of the respective parties, and duly considering the same, I find and report as follows:

Ira C. Brand, the plaintiff, is a resident of the town of Geddes, Onondaga County, and is seventy-five years of age.

On and before the 22d day of January, 1868, he was the owner in fee, and in possession of the lands described in the pleadings, consisting of about seventy-one acres, of the value of about $6,000, subject to a mortgage for $1,000, on which there was due the whole amount of principal and $70 interest, making in all $1,070.

His wife died in June, 1867. He had three children by his wife: John, George and William. John died nearly twenty years ago, while the plaintiff resided upon his farm in Geddes, leaving George and William (the defendant), who are now living. George is about forty years of age, and William about two years his junior. George has a wife and several children, and lives on a small lot of ground, parcel of the premises in question, in a house built thereon by him with the assent of his father. William remained at home and worked on the farm for his father, about six years after he became of age, and then left home and went to Michigan. He was allowed wages for this service. After remaining away about three years, he returned to his father's and worked for him by the month or year, six years, under a written agreement as to wages, and containing a stipulation that he should have the management and control of his father's business, and the sale of the products of the farm.

The $1,000 mortgage above mentioned, was given to Irving Brand, to secure William for the balance which his father owed him for wages.

Brand agt. Brand.

William after his six years had expired, went to Wisconsin and purchased a farm and put on some stock, and was in possession carrying on his farm in Wisconsin in June, 1867, when his mother died.

While William was absent from home, George worked his father's farm, generally upon shares.

After the death of the plaintiff's wife, the plaintiff requested William to come and live with him, he at the time being dissatisfied with George, and complaining of the manner in which he conducted the farm and disposed of the produce. The plaintiff was also unfriendly to George's family, and especially to George's wife, and refused to accept from her, services necessary to make him comfortable, but resorted elsewhere for them.

William left Wisconsin in July, after his mother's death. and made a visit to his father, and while there agreed with his father to break up his business in Wisconsin and come and live with him, and among other things it was understood that William should get married, for reasons which were stated, as a necessary part of the family arrangement.

It was proved to my entire satisfaction, that William refused to come and live with and take care of his father, unless he should be allowed to take the entire possession and control of the farm, and George be required to move off. The brothers were not on friendly terms, and William refused to enter into any arrangement, except upon this condition: that George should be required to leave the premises; but no particular arrangement was entered into until William returned in November following.

After various and repeated attempts to make a satisfactory family arrangement between William and his father, they went to the office of Raynor & Vann, attorneys and counsellors at law, in the city of Syracuse, on the 22d day of January, 1868, and after counseling Mr. Raynor, the parties ordered writings to be drawn, setting forth the terms of their agreement. A conveyance was drawn, conveying to William the premises in question, was signed and executed by his father. A mortgage was also drawn up for William to execute to his father, conditioned for the performance of the agreements on the part of William.

The conveyance was made expressly subject to the agreement, and was in the following form:

"Subject to the payment of a mortgage on said land of $1,000 and interest, to Irving Brand, which said party of the second part is to pay, and also subject to the payment of $1,500 to George S. Brand, said $1,500, as aforesaid, payable in one year after my death, according to a certain mortgage given therefor, and also subject to the support and maintenance of the party of the first part, during his natural life, in a comfortable and suitable manner, or of the payment to the said party of the first part, each and every year, of the sum of $225, in quarterly payments from the first day of January, 1868, during his natural life. The party of the first part hereby reserving the crop of wheat now growing on said farm, and the right to harvest the same, and also the house now occupied by George S. Brand, and the right of said George to remove the same in one year from this date."

It does not satisfactorily appear what particular arrangement the parties had come to in respect to the personal property of the plaintiff. That consisted, among other things, of two horses, wagon, four cows, pigs and farming utensils and household property. The horses, wagon, cows and farming utensils were of the value of about $500. He had also money in bank amounting to about $600, besides other property hereinafter mentioned.

William insisted on having a bill of sale of the horses, wagon, cows, pigs and farming utensils, before he would execute a mortgage to secure the performance of

the covenants before-mentioned. His father proposed to give William the use of them, but was unwilling to transfer them to William. William said that George would sue him for this property, or for the use of it, after his father's death, if he did not have a bill of sale; and insisted on having a bill of sale to keep George from suing him for it after his father's death. Before the arrangement could be completed the parties left and went home. It does not appear that this matter of the personal property was disposed of definitely until the parties met again at Raynor & Vann's office, on the 29th day of January, 1868, to execute new papers, the plaintiff having destroyed the first deed in the mean time, under the circumstances hereinafter stated. When they met there again, the plaintiff blamed George for breaking up the prior conveyance, and proposed to reduce the amount to be paid to him for his portion of the estate from $1,500 to $1,400. This was accordingly done, and new papers executed, the plaintiff executing to William a conveyance of his farm, with the reservations, and agreed to the conditions, before mentioned.

The question then arose as to the personal property, and while the plaintiff was desirous to retain that, the defendant, William, insisted upon a bill of sale before he would execute the mortgage to secure the performance of the covenants and conditions specified in the deed of conveyance. Thereupon the plaintiff signed the bill of sale. conveying to the defendant, William, the horses, cows. pigs, wagon and farming utensils, and then the defendant, William, executed his mortgage on the premisses, to the plaintiff, conditioned as follows: "To pay to the party of the second part, or his certain attorney, heirs, executors, administrators or assigns, the sum of fourteen hundred dollars, in one year from the death of the said party of the second part, and also subject to the support and maintenance of the party of the second part during his natural life, in a comfortable and suitable manner, or for the payment to the said party of the second part of $225 in quarterly payments, from January 1, 1868, during the natural life of the said party of the second part, which said sums and conditions herein named, the said William G. Brand hereby covenants to pay and perform, and when paid thus and so peformed, then these presents shall cease and be void."

This concluded the arrangement, and the parties having duly executed the papers left the office and went back together, and still live together on the premises.

There is some evidence tending to show that the plaintiff did not fully comprehend the force and effect of the bill of sale,—supposing that the only real agreement was to prevent George from calling William to account for the personal property, after his death, and leaving him otherwise to treat it as his own,—although he must have known that it was understood that it was to be used by William and continued on the farm.

In a few days after, the plaintiff proposed to sell one of the cows on his own account, and William then informed him that he had no cows to sell. Thereupon he complained that William had been too sharp for him, and after consulting George and others, was induced to bring this suit to rescind the transactions and be restored to his property, upon the grounds and for the reasons stated in the plaintiff's complaint.

A good deal of evidence was given by both parties on the trial, as to the competency of the plaintiff to transact business, and as to the influence William had over his father, and the reasons which finally induced the plaintiff to make such an arrangement as he did. While I am satisfied upon the evidence that the plaintiff is a man of very inferior intellect, and liable to be imposed upon and deceived by those who transact business with him, I have come to the conclusion that he is not incapable for want of understanding, from making *valid* contracts. I have also come to the conclusion from the evidence, that he is very wavering and unstable in

Brand agt. Brand.

his purposes, and when he is with George, is easily persuaded by him to recant from his contracts, and more easily persuaded by William to do as he wants him to.

After this suit was commenced, he expressed great doubts to one of his neighbors, whether it was not unadvisedly brought. He said William was too sharp; that he wanted.reserved a suitable piece of ground, so that if he got married he might have something for himself, and Willie objected: said he did not really understand but that some of the personal property was to be reserved to him, and there was a paper he did not really understand: said George and others advised him to break it up, but he had about made up his mind to let things remain as they were; said one was pulling him one way, and the other the other way, and he scarcely knew what to do. This expressed the true state of his mind and condition at the time of the transaction, and clearly shows that he was easily led by his two sons, both of whom he was anxious to accommodate and conciliate.

That William came to live with him with the expectation that he was to have a conveyance of the farm, and the entire control of the business of carrying it on, is proved to my entire satisfaction. There is also evidence in the case tending to prove that his father had expressed his intention of giving William the portion of his estate that would have descended to his eldest son John, in case the latter had survived him.

After William returned in November, 1867, there was considerable negotiation between him and his father as to the terms of the family settlement. The plaintiff testified that it was not a great while before William asked for a deed of the farm; that he offered to hire him, or to let him have the farm on shares; but William refused and exacted a deed of the whole; but he told William he was too sharp; then offered him a deed of one third, and to give George a deed of one third, and retain the other third for himself; but that did not suit him. William said he must have a deed of the whole, so as to root George off, and that he would not live by the side of him, and would not take any of the plaintiff's offers. The plaintiff also testified that George lived on the farm about thirty or forty rods off, and that he told George that William wanted a deed of the whole, but that he concluded to divide the farm between them. He further testified that *William told him* if he did not give him a deed of the whole, he would leave and he and George might get along together; that he told William he would like to have him stay, but he could not afford to give up all he had and go to the poor house. He further testified that William wanted the personal property, but he told William he would hold on to that; that he would give him the use of it; but that William wanted a bill of sale to keep George from suing him after his father's death; that William agreed to support him or pay $225 a year for his support and pay George for his portion, $1,600; that he named $2,000 as a proper allowance to George, or something more than $1,600; but William refused to give any more. He further testified that he preferred to make a will, but that William refused, and said many things to dissuade him, among others, stating that George would break it; also, that unless he hurried up the business, George would have him put under guardianship, and urged it upon him so persistently that finally he was overpersuaded and did what William wanted of him. This is the substance of the alleged fraud and undue influence proved on the part of plaintiff.

William, his son, testified in substance as follows:—Worked for his father until 1857, and then went to Michigan. Returned in 1860, and worked five years longer under a written agreement, at $180 per year, besides board and washing, and by the terms of the agreement, he was to have the management of the business and the sale of the crops. After that, worked another year at $360. At the end of that time he went to Wisconsin and bought a farm of 160 acres, at $18 per acre, and

bought team and tools to carry it on. After his mother's death in June, 1867, his father sent for him, and he left his business in a disordered state and came to Geddes immediately; found his father sick at home alone, but a girl came there the next day to do the work, and that he was not married at the time. His father told him he wanted him to come back and take care of him, and he told his father in that case it would be necessary for him to be married, instead of depending upon a housekeeper, as no prudent woman would be willing to stay there and keep house for them, and that he offered to take his father back with him to Wisconsin; but his father was unwilling to leave the place he had worked so hard to improve; that he asked his father if he intended to keep George there; that his father told him he did not; that he had been bothered with George long enough, and could not stand it with him any longer. He told his father that if he got rid of George he would come back; that he had been in a fuss with George there long enough, and had gone a thousand miles to keep out of it; that his father told him he did not wish to go to law with George to get rid of him, but he would fix it so it could be done, and he wanted it done. He then told his father he would come back if he would fix it in that way, and his father told him as soon as he got out he would have it arranged. He told his father he could not change his situation without great loss; that he had bought when things were high, and now the markets were very low. His father told him he should lose nothing, and upon that arrangement he went back to Wisconsin, sold his personal property, rented his farm and returned to his father's home in Geddes in the following November. Shortly after his return he asked his father if he had made out the writings as he talked of, and his father said he had not; that he asked his father what he was going to do about it, and his father replied that he wanted him to go on and pay up the thousand dollar mortgage, and after that he could have what he could make on the place; he told his father that would not answer his purposes; that he could not afford to spend his time there on uncertainties; that he wanted to have writings drawn, so that he would not be working for somebody else; that his father proposed a will, and he told his father a will would be very uncertain, and he could alter it at any time he saw fit; that he could not go on and fix up the place, do what was absolutely necessary, and pay out his money to do it without some better security. His father then proposed to give him a deed of one half of the farm; but he told his father he could not afford to leave his business, with 150 acres of improved land of his own, and come back and undertake to make a living off of twenty acres of improved land, and if he had anything to do with the farm he wanted the whole of it. His father then said he would give him a deed of the whole, except the personal property. He then told his father he could not afford to work and raise grain to keep cattle and horses, and whenever there was a hog to sell, or a pound of butter, they would belong to somebody else, and somebody else would take the money. His father then told him he would give him the *use* of the personal property; but he told his father he wanted something to show in case he should be taken away, that George could not sue him for the *use* of the personal property; his father told him he would fix it so he could not. He then told his father he would take the farm; would buy it of him on these conditions, viz. :—pay the thousand dollar mortgage; pay George whatever he said he wanted him to have, one year after his father's death, and take the personal property in consideration of his loss and expenses in selling out, and support his father as long as he lived, and be bound to support him; to which proposition his father gave his assent. No sum was fixed upon at that time to give George. When they came to Raynor & Vann's office for advice, about a week before the writings were drawn, the sum to be paid to George was discussed between them. His father said he considered he had already paid or advanced George $300; said

George had always been saucy and ugly to him, and he never meant to give him half of his property, while William had helped him improve the farm and make it valuable; and he had always calculated William should have the most, and that he calculated to live with William, and wished it fixed so he could live with him. That Raynor advised a lease, but his father thought not. The amount to be settled upon George was not yet agreed upon. Before going back to Raynor & Vann's office again, and during the intervening week, he asked his father what sum he proposed to give George, and his father said he thought about $2.000; that he then told his father he had always talked about giving him $1,000, and his father replied that he had reflected upon it since; that that would not be enough, and he ought to give him more. He then told his father that he had better give him (William) something for his expense and trouble in coming down here, give him $1,500 for his portion of the estate, and let George have the rest and take care of him. His father said it would be poor support he would get at his (George's) hands, and said if he did it he would not keep it, and in two years he would be out of house and home, and said he wanted him (William) to have it. He then told his father he would take it if he rather have him do so, and his father said he thought George had already the value of $300; that he held two notes against him amounting to about $200; that would make $500, and he would give him up the notes. He (William) assented to this, and under this arrangement they went together to Raynor & Vann's office to have the writings drawn, and the first deed was drawn and signed as before stated. After the first deed was destroyed, his father wanted him to go to Raynor's office, and make out the papers again before George had time to serve the papers to show cause why a guardian should not be appointed, stating that he had been informed that George was trying to do that. He told his father in reply that he did not want anything to do with it, and he had rather pay him or deduct from his damages in coming here, $300 than have anything to do with it. His father then told him he would dock George $100 for his interference in getting up the first deed, and that he then advised his father not to deliver up the notes to George.

William further testified that the matters were all talked over freely in the office of Raynor & Vann and all the papers carefully read over to him.

In this respect he is fully sustained by Mr. Vann.

After this suit had been set down for trial, his father came to the office of his attorney in Syracuse to have the suit settled. William testifies that his father told him, he could blame George for it, for he never would have sued him if it had not been for George; that he did not want to sue and told George it would make a fuss; that his father then told his attorney that he wanted to stop the suit, and his attorney told him when the costs were paid he would discontinue it. The costs were fixed at $40, and his father told his attorney he had not got the money to pay it. His father wanted William to sell some wheat and pay it, and he sold some and gave his father $45 to enable him to pay his lawyer. After that his father told him he had been to see his lawyer and he charged him too much and he would not pay it. This testimony is not contradicted.

There is also some evidence contradicting the statement of the defendant William, in relation to his father's urging him to come and take care of him as well as other material portions of his statements. The plaintiff told John Fry, one of his neighbors, that he would not let George have the farm any more, but let a stranger have it first. He complained to Arthur Rooney, another neighbor, that George and his family had abused him, and he was going to get rid of George another year, and get William there. He told Mrs. Fry, that he intended to get William back and stay as long as he lived. He told Mr. Remington, another of his neighbors, soon

after the loss of his wife, that when he got William back, he was going to get George off from the place; found a good deal of fault with George and accused him of taking property—said he was saucy to him; said William had helped him clear off the farm—had staid at home and worked and helped him pay for it; and told him at different times that he intended William to have John's portion. He told Mrs. Fry that he intended to get William back and have him stay with him as long as he lived.

I am satisfied upon the evidence that William was not guilty of any fraud in obtaining the deed of conveyance, although it is apparent that the plaintiff has but little power to resist the influence upon him of either of his sons in the absence of the other. This controversy is really between the two sons, and either of them seem to have sufficient influence over his father to command his acquiesence in whatever course he wishes to adopt towards the other, for the settlement and division of his estate. This suit is evidently undertaken at the instance of George, and is carried on for his benefit rather than for the benefit of his father. Although the plaintiff plainly sees that it is giving him a good deal of trouble and although he knows that it connot probably result to his benefit whatever the result may be ; and although he would gladly settle it and be at peace, he has not sufficient mental energy and independence to put a stop to it.

The evidence also satisfies me that the final settlement as evidenced by the papers was in a great measure brought about by the influence of the defendant William. The old gentleman was anxious, above all things, to have his son, William, return home and take care of him, and the fear of losing him was the controling sentiment, which induced him finally to yield to the exactions required of him, as a condition of his doing so.

But I am not satisfied that William used, what in law is termed *undue influence* to bring about that result. His father yielded to arguments and persuasion, such as a weak old man would be likely to do, under the same or similar circumstances. He had an undoubted right to settle all his estate on one of his sons to the exclusion of the other. If he was not misled and over-reached by playing improperly upon his fears, or by concealing facts which it was necessary he should know in order to enable him to comprehend what he was about to do, the influence brought to bear upon him was not fraudulent, but only such influence, as a father has a right to yield to, in the disposition of his property.

The whole subject in all its bearings or details, was already pointed out and fully explained to him by Mr. Raynor, to whom he applied for assistance in making out the papers. The papers were carefully prepared and read over to him. He knew what he was doing, and then chose to do it in the form in which it was finally agreed upon between the father and son. If we give to plaintiff sufficient intellect to do business and dispose of his estate, there are no grounds upon which it can be maintained that the conveyance of his estate may not be permitted. It was not a new thing for him to consider, and he could not have been taken by surprise or over-reached by strategem. The most that can be claimed is, that he yielded to the conditions imposed upon him by William, because he was anxious to have William remain with him and support him in his old age. He comprehended their nature and import, *and rather than have William leave him and go away again, he preferred to submit to his exactions.*

If the conveyance should be avoided, there is no knowing what will happen to him next. If he is allowed to take his own course, without being excited to disaffection by others, it is almost certain that he would hereafter submit to still greater exactions, if necessary, *to procure William to take charge of his affairs, and support him in his declining years.*

Brand agt. Brand.

It is apparent to me that it will be for his interest and welfare to allow the settlement to stand; and the evidence satisfies me *that if he had been let alone,* he would have been as satisfied with what he had done as with any other arrangement which could have been made for his benefit. Notwithstanding this action, it seems he still remains with William, eats at his table, and is kindly treated, and his wants carefully provided for. The object of the suit is rather to benefit his son George, than because of any apprehension that he will not be well treated by William. If I could see any real benefit it would be to the plaintiff to set aside the settlement, I should try to find sufficient evidence to justify a decree setting it aside. But regarding his welfare as a paramount object, it does not appear to me that it would be advantageous to him to disturb the settlement. His real estate is worth probably $6,000. The personal property transferred to William may be valued at $500. He had other personal property, which, together with the notes against George and his bank deposit amounted to $1,000, or thereabouts. William states without contradiction, that his father estimated that he had given or advanced George $300, and held his notes for about $200, which he intended to surrender, which would give George in the neighborhood of $1,900, as his portion of his father's estate. That it was not made $2,000, the sum first proposed by the old gentleman, was at his instance, for the reason that George had induced him, as he thought improperly, to destroy the first deed. Regarding the real estate as of the value of $6,000, it is charged in William's hands with the payment of an annuity of $225, the present value of which may be stated at $1,000, or nearly that sum. It is also charged with the payment of a mortgage of $1,000 which, with interest, amounted at the time to about the sum of $1,070.

Deducting these incumbrances and the remaining value may be stated in round numbers at $4,000. This would leave $2,000 to be equally divided between the brothers in case the old gentleman should desire to make them equal. Now of this sum his son George is secured the sum of $1,400, which is not to be regarded as a very unjust division, under the circumstances. As to the personal property the amount could not exceed probably much if anything over $1,500. Of this amount George's notes held by his father amounted to about $200, which were to be surrendered, according to the declared intention of the old gentleman, when he made the settlement; and to that must be added, I think, the sum of $300, which he stated he had already advanced to him. If William was to be allowed anything of consequence (as he thought, not unreasonably, he should be,) for his loss and trouble in breaking up his business in Wisconsin, and coming to Geddes, to reside, the personal property transferred to him, cannot be regarded as an extravagant compensation. In this aspect of the case, George would secure nearly $2,000 of his fathers estate, and William $2,600 having that advantage only over his brother George. These seem to have been the views of William and his father pending the negotiation between them as to what would be a fair and equitable division of his property. There are strong reasons for believing that it was the settled intention of the plaintiff to give William the largest portion of his estate, especially if he returned home and took care of him during his life. The final arrangement is not so unequal or unreasonable as to induce the court to believe that it was unadvisedly made or that it would be for the interest of the plaintiff to have it set aside. The law is well settled that a man of very inferior intellect may make valid settlements of his estate. If these instruments have not been procured by fraudulent practices or concealments, they are not to be set aside because the person making them afterwards changes his mind. I do not find as a fact in this case, that the conveyance was obtained by fraud, or undue influence and I therefore hold as a matter of law, that the action cannot be sustained. A provision was made in the conveyance,

Brand agt. Brand.

allowing George one year to remove his buildings. On the defendants executing a valid stipulation giving him another year to remove his buildings or to pay their present value, as erections on said premises in one year from date, then I order judgment for the defendant dismissing the plaintiff's complaint, but without costs.

LEROY MORGAN,<br>
*Referee.*

*(Title of cause).* EXCEPTIONS.

1. The plaintiff herein by his counsel, excepts to that part of the report of the referee in this action, which states: " And among other things it was understood that William should get married, for reasons which were stated, as a necessary part of the family arrangement"—*as being unsupported by the evidence.*

2. The plaintiff also excepts to that part of the referee's report which states, "although he (meaning the father,) must have known that it was understood that it (meaning the personal property,) was to be used by William and continued on the farm,—*as being* an inference which cannot be *legitimately drawn* from the evidence.

3. The plaintiff also excepts to that part of the referee's report which states—" Said he did not really understand, but that some of the personal property was to be reserved to him"—as being against the weight of the entire evidence relating to the disposition of the personal property.

4. The plaintiff also excepts to that part of the referee's report which states—" Worked for his father until 1857,"—as against the evidence.

5. The plaintiff also excepts to that part of the referee's report which states—" Found his father sick at home " alone,"—as against *the evidence.*

6. The plaintiff also excepts to that part of the referee's report which states—" The old gentleman was anxious above all things, to have his son William return home and take care of him, and the fear of losing him was the controling sentiment which induced him finally to yield to the exactions required of him,"—as being inferences not supported or warranted by the evidence.

7. The plaintiff also excepts to that part of the referee's report which states—commencing with the words—" He knew what he was doing, &c.," down to and including the words " He preferred to submit to his exactions,"—as embracing conclusions which are against the evidence, which are *unsupported by the evidence,* and which are positively contradicted by the evidence.

8. The plaintiff also excepts to that part of the referee's report which states—" If he is allowed to take his own course without being excited to disaffection by others, it is almost certain that he would hereafter submit to still greater exactions, if necessary, to procure William to take charge of his affairs and support him in his declining years,"—as being also an inference unwarranted by the entire evidence in the case.

9. The plaintiff also excepts to that part of the referee's report which states—" Notwithstanding this action, it seems he still remains with William, eats at his table, and is kindly treated and his wants carefully provided for,"—as being unsupported *by any evidence.*

10. The plaintiff also excepts to that part of the referee's report which states—" Now of this sum his son George is secured the sum of $1,400,"—as being against the evidence.

11. The plaintiff also excepts to that part of the referee's report which states—" Was induced to bring this suit to rescind the transactions and be restored to his property upon the grounds and for the reasons stated in the plaintiff's complaint."

Brand agt. Brand.

12. The plaintiff also excepts to the conclusion of the referee that *no undue* influence had been exercised by the defendant over the plaintiff in obtaining the deed and bill of sale in question, and also to his final determination to dismiss the plaintiff's complaint herein, for the reasons that said referee has said in his report that —" If the conveyance should be avoided, there is no knowing what will happen to him (meaning plaintiff) next. If he is allowed to take his own course, without being excited to disaffection by others, it is almost certain that he would hereafter submit to still greater exactions, if necessary, to procure William to take charge of his affairs and support him in his declining years."

And has also said:

" It is apparent to me that it will be for his interest to allow the settlement to stand, and the evidence satisfies me that if he had been let alone, he would have been as satisfied with what he had done, as with any other arrangement which could have been made for his benefit."

And has also said:

" If I could see any real benefit it could be to the plaintiff to set aside the settlement, I should try to find sufficient evidence to justify a decree setting it aside; but, regarding his welfare as the paramount object, it does not appear to me that it would be advantageous to him to disturb the settlement:—"

The referee appearing, by his report, clearly to have been influenced in his above findings, and in his final determination to dismiss the complaint, by the consideration that the plaintiff might, in his weak and wavering state of mind, be induced by defendant to make even a worse disposition of his property for himself, and that no ultimate benefit might result to him, from setting the conveyance and bill of sale aside, and that, therefore, the referee refused his prayer.

The plaintiff also requested the referee to find that since, by the evidence William had almost unlimited control of his father's affairs, for many years prior to his mother's death, and since, by the evidence, he had made repeated efforts prior to her death to obtain a division of his father's property, by which he was to have much the larger share, and was only defeated in such efforts by the opposition of his mother; and since the father always confided most in William, as is evidenced by the fact that he allowed him to manage the farm for years under a written contract which gave him entire and unlimited control over his father's business, and was *dissatisfied with George;* and since the mother being dead, there was no one left now who could successfully resist the defendant's attempts upon his father to obtain his property; that, therefore, notwithstanding the plaintiff's preferences for his son William, for William to induce his father to deed him the whole farm and give him a bill of sale of the personal property, on the following grounds, to wit:

1st. By inducing his father, through his well known dislike of his oldest son George to deed him (William) the property, and by telling him that unless he did so, George would harass him until he got hold of his property and then would squander it; and—

2d. By accusing his father of incompetency and imbecility, and by telling him that a will would not do because it would be too uncertain, and that George would break it up after his death; and—

3d. By urging the plaintiff to give him the deed and bill of sale quickly, if he was ever going to, before George could serve papers on him to show cause why a guardian should not be appointed over him; telling him that George was going to do that, was an improper exercise of the influence which William had over his father, this plaintiff, and constituted sufficient ground, in equity, to set aside the conveyance and bill of sale procured thereby, or at all events in consequence thereof.

Which the said referee refused to find, and the plaintiff, by his counsel, in due time and form, excepted to such refusal.

The plaintiff also requested the referee to find that *slight evidence* of the improper exercise of the influence which arises from the near and confidential relations of father to son, as in this case, is sufficient ground for relief in a court of equity ; and since William appealed to the plaintiff's well known dislike of his son George, and reminded him of his own incompetency to make a valid disposition of his property by a last will and testament, and induced him to make haste and execute the deed and bill of sale before George could serve papers on him to show cause why a guardian should not be appointed over him, telling him that George was going to do that, was not only *slight*, but *strong* evidence of the improper exercise of the influence arising from the relations the parties sustained to each other, and the conveyances procured thereby, should be set aside.

Which the said referee refused to find, and the plaintiff excepted to such refusal.

The plaintiff also requested the referee to find that since the plaintiff executed the bill of sale in question without understanding its import, and without having it fully explained to him, but was induced by William to believe that it was only a paper to keep George from suing William for the use of the personal property after the plaintiff's death, without transferring the title or ownership of said personal property from the plaintiff to the defendant William, the said bill of sale is void and should be set aside.

Which the said referee refused to find, and the plaintiff excepted to such refusal.

The plaintiff also requested the referee to find that since the $1,000 mortgage covers only the north half of the said farm in question, and is wholly due and unpaid; and since the mortgage given by William to his father, payable to George one year after his father's death, also covers only the same said north half of said farm ; and since it is in proof that neither the plaintiff, nor the son George, are able to take up or pay the $1,000 mortgage, it follows that the foreclosure of the $1,000 mortgage would cut off the $1,400 morgage, and the said sum of $1,400 is *not* secured by a valid security to be paid to George, by William, one year after his father's death, but that it lies within the power of William, by permitting a foreclosure of the $1,000 mortgage, to destroy the lien of the $1,400 mortgage altogether, show a fraud and indicate a frudulent intent on the part of William sufficient to avoid the conveyances in question.

Which the referee refused to find, and the plaintiff excepted to such refusal.

---

(*Title of cause.*)

JUDGMENT FOR DEFENDANTS ON REPORT OF REFEREE, JANUARY 25, 1869.

This action having been referred to Hon. LE ROY MORGAN, sole referee, to hear try, and determine the same, according to the rules and practice of this court, and said referee having heard the same and duly deliberated thereon, made and filed his report wherein and whereby he finds that the conveyance and sale from the above-named plaintiff to the defendant, William G. Brand, of the real and personal property set forth in the complaint in this action, was fair and *bona fide*, and that the same was not induced or procured by fraud or undue influence ; and that said plaintiff was at the time of making such sale and conveyance, well-informed and fully capable of contracting and making said sale and conveyance :—

Wherefore it is adjudged that said defendants have and recover judgment against the said plaintiff in this action ; and it is further adjudged that the said sale and conveyance made and executed by said plaintiff to said defendant, William G.

Brand, be and the same hereby is, in all things, ratified and confirmed, but without costs to either party as against the other in said action.

.THEO. L. POOLE, *Clerk.*

Filed, January 25, 1869, 5 P. M.

(*Title of cause.*)     NOTICE OF APPEAL FROM JUDGMENT.

PLEASE TAKE NOTICE :—That the plaintiff appeals to the general term of this court from the judgment entered in the clerk's office of the county of Onondaga, in this action, on the 25th day of January, 1869, in favor of the defendants and against the plaintiff, dismissing the plaintiff's complaint therein.

T. K. FULLER,
*Attorney for Appellant.*

*To* RAYNOR & VANN, *Attorneys for defendants,* and
THEO. L. POOLE, *Clerk of Onondaga County.*

T. K. FULLER, *counsel for plaintiff.*

THIS action was brought to set aside the conveyance of a farm and a bill of sale of personal property, on the grounds of fraud and undue influence, and to restore to the plaintiff his property.

The plaintiff is the father of the defendant, William, in whom for years he had placed implicit confidence.

The cause was referred to his honor, Judge MORGAN, as sole referee, to hear and determine the same, who reported in favor of the defendants.

From the judgment entered upon that report, this appeal is taken.

POINT I.—*Rulings.*—(*a*) It was error for the referee to exclude the evidence offered by plaintiff, at *fol.* 218.

Ill treatment of the father by the son, after he had got his property, bears upon the question of the son's original intent in obtaining the property—showing that his object was, not the comfort and happiness of his father, but to get possession of his property, and then harrass him out of existence.

Such an *intent* as subsequent ill treatment of the father would disclose, would bear upon the question of the *undue influence*, exercised by the son over the father in obtaining

his property, as to whether, with evil intent in mind, he would not exert it, if in his power to do so; and the evidence offered was certainly admissible in this view.

"Fraud," (or undue influence) "is not ordinarily capable of being established by direct affirmative proof. Any evidence, *having a tendency*, though it may be slight, to establish fraud, is not incompetent. Necessarily, considerable latitude is to be allowed in giving evidence of circumstances tending to prove the fraudulent intent." (*Hubbard* agt. *Briggs*, 31 *N. Y.*, 538.)

After excluding this evidence, as to the treatment of the plaintiff by the defendant, it is difficult to see how the learned referee could find, as he did find at *fol.* 133, that "Notwithstanding this action, it seems he still remains with William, eats at his table, and is kindly treated, and his wants carefully provided for," as there is not a word of evidence in the entire case to support such a finding, but, on the contrary, all evidence on that subject had been carefully excluded.

(*b*) The referee erred in excluding the evidence offered at *fol.* 249.

The witness, the Hon. George Geddes, who had known the plaintiff for forty years, was *competent* to answer the question propounded.

The evidence was material,—showing that the mind of the plaintiff was in a condition so weak and vacillating that he could easily be influenced by his son William to do any act dictated by him. It bore, therefore, directly upon the question of the plaintiff's incompetency, and the ease with which *undue influence* could be exerted over him; and, as the plaintiff's incompetency to transact business was one of the issues in the case, the evidence offered was material, and should have been received.

(*c*) It was error to admit the testimony of Irving G. Vann, under the plaintiff's objections, raised at *fols.* 378, 379, 380, 381, 386, 390, 397, all of which were renewed and more

carefully and specifically stated on a motion to strike out, at *fols.* 407 to 415 inclusive.

At the times in question Raynor & Vann were the attorneys of the plaintiff, who sought them for counsel in regard to the disposition of his property, and employed them to draw the papers.

Mr. Vann swears distinctly, at *fol.* 401 : "We were not attorneys of William G. Brand until after this suit commenced, to my knowledge," though different somewhat at *fol.* 404.

Having acted as the father's attorney and counsel until the son had stripped him of his property, they drop the old gentleman and espouse the cause of William (*fol.* 286), and come into court giving evidence of the plaintiff's declarations made to them, at their office, when in his professional employ, and against his will.

This practice on the part of attorneys cannot be too loudly condemned.

It reflects seriously under ordinary circumstances; but when an attorney drops a client and takes up the cause of his adversary, and voluntarily attempts to gain that cause by giving evidence of the client's statements and admissions made to him in professional confidence, the reflection becomes more serious.

The correct doctrine on the subject of privileged communications between attorney and client, seems to be well stated in the terse and pointed language of the chancellor in the case of the *Bank of Utica* agt. *Mersereau*, 3 *Barb. Ch. R.*, 595.

"The true principle, in reference to privileged communications between attorney and client, is, that where the attorney is *professionally employed*, any communication made to him by his client, with reference to the *object* or the *subject* of such employment, is under the seal of professional confidence, and is entitled to protection as a privileged communication."

"This seal of professional confidence is not the seal of the attorney, but of the client, which the attorney is, *by law* as well as by *professional honor*, bound to keep intact; and it cannot be removed except by the consent of the client."

"The seal which the law once fixes upon such commucations remains forever, unless removed by the party himself in whose favor it was there placed."

The chancellor further holds, that the only exception to the doctrine as above stated, is where communications are made to an attorney to obtain professional advice or assistance as to the commission of a felony, or other crime which is *malum in se*.

Even in cases where an attorney is employed by clients to assist them in a transaction which, from what was said in his presence, he must have known to be a fraud upon their creditors, the seal of professional confidence is, nevertheless, stamped upon their communication.

However much more satisfactory it might be, that this privileged relation of attorney and client should exist only for honest purposes, and not to enable the client to perpetrate a fraud, or evade the laws, under advice of counsel, still the law appears to be settled otherwise.

"This protection extends to every communication which the client makes to his legal adviser, for the purpose of professional advice or aid, upon the subject of his rights or liabilities." (1 *Greenleaf's Ev.*, 271.)

"If the attorney was consulted merely as a *conveyancer*, to draw deeds of conveyance, the communications made to him in that capacity are within the rule of protection, even though he was employed as the mutual adviser and counsel of both parties." (1 *Greenleaf's Ev.*, 275.)

The extent and sacredness of this privilege are ably commented on by the vice-chancellor, in *March* agt. *Ludlum*, 3 *Sandf. Ch. R.*, 45, and numerous authorities cited. Also, in *Crosby* agt. *Berger*, (11 *Paige Ch. R.*, 377); *Sibley* agt.

Brand agt. Brand.

*Waffle,* (16 *N. Y.,* 180); *Williams.* agt. *Fitch,* (18 *N. Y.,* 546.)

The case of *Whiting* agt. *Barney,* (30 *N. Y.,* 330.) seems at first view, to hold a different doctrine; in which the learned Justice SELDEN, in his opinion, seems to go the length of suggesting that, since the Code, § 390, compelling a party to testify in his own suit at the instance of the adverse party, the reason of this rule is removed and the necessity for its continuance terminated. The learned justice seems to have been alone on that point, though four others reached the same general conclusion, on other grounds, of reversal, and three were for affirmance. This case was first reported in 38 *Barb.,* 393. It came up on an appeal from a judgment entered at special term, under the direction of the justice, in favor of the plaintiff, in an action to set aside and cancel a bond and mortgage executed by the plaintiff to the defendant's testator, on the ground of usury,

The evidence of the attorney who drew the papers was admitted at special term, under objection. The general term reversed the judgment and ordered a new trial.

An appeal was taken to the court of appeals, which reversed the judgment of both general and special terms, and granted a new trial in the case.

This case is ably commented on in a note in a late edition of *Edwards' Chancery Reports, Stuyvesant* agt. *Peckham,* (3 *Edwards' Ch. R.,* 610,) to which I invite attention.

In the light of the authorities, and of the relation of the parties as disclosed by Mr. Vann's evidence, at *fols.* 377, 385, 404, and the plaintiff's evidence at *fol.* 195, it is respectfully submitted that the evidence of the former should have been stricken out.

(*d.*) It was error to admit the evidence objected to at *fol.* 405.

The evidence was incompetent, because it called for an *opinion* from the witness.

Precisely the same kind of evidence which the referee

excluded at *fol.* 249, in case of the witness, Hon. Geo. Geddes, who was questioned by the plaintiff.

One or the other ruling must be wrong.

POINT II.—*Exceptions*—(*a.*) The first exception occurs at. *fols.* 145-'6, relating to the report at *fol.* 64

All the evidence introduced on the subject of William's marriage, was brought out by the defense, and yet it fails to support, as I view it, the referee's conclusion on that point.

This talk was in *July.* Not a word said afterwards, on that subject, by either party. William returns in November, and finds his father quite smart. In July, sick.

Now, the father rejects the void arrangement which William had pressed him into in July, when sick, and proposes other arrangements more equitable and just.

William's version is given at *fol.* 307, *et seq.*

His father's, at *fol.* 187, *et seq.*

From the time of William's return in November, when the pretended July arrangements were rejected by the father, until the 29th of the following January, the day the last deed was given, *not a word was said between these parties about this marriage !*—and this, too, notwithstanding the fact that William took counsel about the property prior to the marriage, but *don't recollect* whether or not he was advised to *marry* before he took the deed. *(fol. 338).*

The referee aids me at this point, and virtually confirms my position, afterwards, in his report, where he says, at *fol.* 66,—"But no particular arrangement was entered into, until William returned in November following."

The evidence shows that none was entered into until nearly three months afterwards; and that, under immense pressure on the part of William upon his father.

There is no evidence, therefore, to show that this marriage was a part of the arrangement as it was finally made.

(*b.*) The second and third exceptions will be considered together as they necessitate the examination of substantially the same points in the case.

They are found at *fols.* 147, 148, relating to *fols.* 78 and 93 of the report.

Here, I remark, the *entire evidence* in reference to the personal property goes to show,—

*1st.* That the plaintiff never intended to divest himself of his personal property, and did not suppose that, by giving the bill of sale, he was doing it.

*2d.* That he did not know what a bill of sale meant— that it was not explained to him at the time he signed it; but that he supposed it to be, as William had told him, merely a paper to keep George from suing William for the *use* of the personal property after his, the plaintiff's death, —having no effect to make the property William's.

*3d.* That William's telling his father he wanted the bill of sale, so as to keep George off, was a mere deception on his part to get his father to do what he did not intend to do, and what, if he had known, he would not have done.

*First.* The plaintiff's evidence is found at *fols.* 212 to 216 inclusive.

*Second.* The evidence of Geo. S. Brand commences at *fol.* 243, and continued at *fols.* 258, 277-'8.

*Third.* Benjamin Cowan testifies on this point at *fols.* 283-4-5-6.

The above is all the evidence adduced by the plaintiff touching the personal property.

It is not only admitted, but strengthened by the evidence of William, at *fols.* 309-10, also 319-20-21, and 331-2-9.

Defendant's witness, Ann Fry, says at *fol.* 348, " plaintiff told me there was a paper got up about the personal property, that he did not understand."

Mr. Vann speaks on this subject at *fols.* 393, 395-6, and expressly confirms the old gentleman and contradicts William; but at *fols.* 398 to 402, which relate to the third and last interview mentioned by him, he contradicts William again as to the plaintiff's understanding, and the explanation of that bill of sale.

Now, what I desire to say here is, Mr. Vann may be correct as to the old man's statement at this interview; but after all that had passed between these parties on the subject of personal property, it is fair and just to infer, that the plaintiff promised and gave that bill of sale in the light of William's explanations—to wit, that it was "only a paper to keep George off."

The entire evidence, except Mr. Vann's, goes to show that the plaintiff never intended to part with the ownership of his personal property, and after he had signed that bill of sale, he did not suppose that he had—as his subsequent conduct clearly shows.

Mr. Vann swears that he read the deed and bill of sale to plaintiff, and asked him if he understood them; and the plaintiff said he did; but Williams wears at *fol.* 319, that "Raynor read the bill of sale to father; can't say that Raynor explained it;" that his father was not told the effect of it.

The referee has disregarded, apparently, the great and overwhelming weight of evidence in regard to that *bill of sale*, or its validity.

It was procured, manifestly, by William's fraud and deception, in misrepresenting its nature and effect, and is, therefore, void.

But this fraud as to the bill of sale is but part and parcel of the gigantic fraud that stripped the old man of his entire property.

(*c.*) The fourth exception is undoubtedly well taken—*fol.* 148, referring to *fol.* 101 of the report.

The evidence on this subject is found at *fol.* 292 *et seq.* Unsupported by evidence.

(*d.*) The fifth exception is equally well taken,—*fol.* 149, referring to *fol.* 102 of the report. The evidence at *fol.* 300 settles the error in the report on this point. Against evidence.

(*e.*) The sixth and seventh exceptions refer to *fols.* 126 to 131 of the report.

I desire to combine with these exceptions, the first "request to find," and argue them together, for the sake of brevity.

They cover the report from *fols.* 126 to 131.

The question arises, what is UNDUE INFLUENCE, as it is termed in law.

1. It is distinguishable from fraud, &c.

2. It implies a confidential relation between the parties, and also confidence given, and influence acquired by reason of such relation.

Fraud, false pretense, deceit, &c., are terms more appropriately employed to denote cheating among strangers, neighbors, or men in the business world.

In proportion to men's estranged relationship, and social or business distance, is their *watchfulness* over, and distrust of each other in all business transactions.

In proportion to this watchfulness and distrust, is there less danger of fraud. If fraud be alleged in such cases, it should, for obvious reasons, *be established by clear and indisputable proof*,—it should not be inferred from slight circumstances.

This rule relaxes, and justly, as you pass from the more estranged relationships, to those of greater confidence and intimacy. These relationships are the more sacred, because they imply, not unfrequently, the dependence of age and infirmity, upon the strength and manhood of a son,—the confidence of a sister in a brother's friendly regard,—of a patient, in the advice and treatment of his physician,—of a client in the counsels of his attorney,—of a member of the christian flock in the pastor.

*Undue influence,* as I understand it, is the term applied where fraud and deceit are practiced by parties upon those who sustain some near and confidential relation to them. It is baser than fraud, because it adds to fraud, abused confidence.

It is meaner than deceit, because it adds to deceit, breach of faith and trust reposed.

It is more wicked than false pretense, because it adds to false pretense, hypocrisy.

Being willing to perpetrate wrong, it adds thereto, treachery to friendship, treachery to duty and hostility to truth.

It wins by villainous smiles, by practicing upon credulity, by awakening groundless fears, by promises to deceive, by threats to intimidate age and infirmity.

The proof of *undue influence* is slight in proportion to the nearness and closeness of this relationship.

Parties sustaining these relations shall not profit by treachery to them.

The rule is just and equitable, that " where a grant is made by an aged father to his child with whom he lives, who has the management of his property, and in whom he reposes particular confidence, if a court of equity sees that any arts or stratagems, or any undue means, or the *least speck* of imposition, or the least scintilla of fraud entered into the bargain, it will avoid the grant." (3 *Cow.*, 538.)

How was undue influence exercised in this case by William, and shown, too, by uncontradicted evidence?

1. By constant and incessant importunity of his father. *(Fols.* 188 to 192, 237.)

2. By reminding him of his own weakness and incapacity to do business, as shown by the contract, and by plaintiff's proof.

3. By appealing to his well-known dislike of George— telling him that George would get his property and squander it. (*Fol.* 188.)

4. By exciting his fears, that a guardian was to be appointed over him, and hurrying him up for that reason, to make out the papers and give him the property. (*Fol.* 254.)

5. By rejecting the old man's various proposals to make a will, saying that would be too uncertain, and George would break it up,—*fols.* 194, 308,—to deed each a third,

and keep a third himself, *fol.* 189,—or to deed William a full half, *fols.* 188, 308,—saying he must have the whole, or he would leave his father to the tender mercies of George, the son whom he hated, and which hatred he was daily trying to excite more and more, to accomplish his purposes. (*Fol.* 191.)

The referee calls these things by the kind names of "*arguments* and *persuasion,* such as a weak old man would be likely to yield to under the same or similar circumstances." (*Fol.* 127.)

Argument, indeed! but accompanied by threats and intimidations which prevail over the old man's will, against which his remonstrance was idle!

Persuasion! but of that savage kind, which says, do thus, or suffer!

The referee says, at *fol.* 128, "If he was not misled or overreached by playing improperly upon his fears, or by concealing facts which it was necessary he should know in order to enable him to comprehend what he was about to do, the influence brought to bear upon him was not fraudulent, but only such influence as a father has a right to yield to, in the disposition of his property."

How can the referee say that the old man was not misled, and his fears not improperly played upon, when William told him what George would do? When he told him if he did not hurry up the papers, George would have a guardian over him, and then he could not stir a peg, nor move any of his property.

Is this spur in the old man's side,—this dread and fear, which William inspired, of being subjected to the control of a committee, like a lunatic, or a *non compos mentis,* to be called by the kind terms of *argument* and *persuasion* and such as a father has a *right* to yield to in the disposition of his property?—a *right,* certainly; but similar to one's right to deliver his watch and valuables to the highwayman, by reason of his logic and persuasion.

How can the referee hold that the plaintiff was not *misled*, as to that bill of sale, when William virtually confesses that he misled him, by telling him that it was only a paper to keep George from suing for the use of the personal property after his death, when as late as next to the last interview at Raynor's office, Mr. Vann tells us that he said "he should hang on to the personal property;" but a week afterwards consents to a paper to keep George off—which turns out to be a regular bill of sale?

If the old man knew what he had done, why did he propose, the next morning, to sell one of the cows?—making it necessary then, for the first time, for William to lay claim to the personal property by reason of this bill of sale. Why did he go straightway to George, and to Mr. Cowan, and to Mrs. Fry, and inquire what a bill of sale meant, and for the first time learn the deceit that had been practiced upon him? This conduct was either *knavish or foolish*. But William answers, at *fol.* 310, which I quote:—"Father said, then, he would give me the *use* of the personal property; I told him I wanted something to show, that in case he should be taken away, George couldn't sue me for the use of the personal property; said he would fix it so he couldn't."

Also, at *fol.* 339—"It was the understanding that I was to have the *use* of the personal property on acount of my expenses; that was the idea of the bill of sale."

Also, at *fol.* 319, William swears that "Raynor read the bill of sale to father,"—"didn't explain it, and father was not told the effect of it."

William was there; saw him sign, knew he was ignorant of what he was about, and yet, did not set him right, nor explain to him, until after the paper was signed and delivered, and the property secure in his own possession.

Did William really suppose that George could sue him for the use of that personal property after the old man's death?

William knew better. He knew his father was deceived, and he suffered him to remain so. This was fraud.

This evidence is not contradicted—it has been overlooked by the referee. It discloses fraud and a fraudulent intent.

It brings the case within *Whelan* agt. *Whelan*, (3 *Cow.*, 537 ; *See opinion p.*, 572 ;) also, *Brice* agt. *Brice*, (5 *Barb.*, 533 ;) *Voorhis* agt. *Voorhis*, (39 *N. Y.*, 463).

The bill of sale is, therefore, void, and should be set aside.

The referee appears, by his report, to have been troubled somewhat about this bill of sale.—His finding that it is valid, is to be inferred merely; it is not stated. The nearest he comes to it is at *fol.* 142—"If these instruments have not been procured by fraudulent practices or concealments, they are not to be set aside because the person making them afterwards changes his mind."

He then finds the conveyance all right, but leaves the bill of sale to "paddle its own canoe," without the bolster of a direct finding.

But of this hereafter.

(*f.*) The eighth exception is embraced in the twelfth.

The ninth at *fol.* 153, report 133, is well taken. There is no evidence to support it. The plaintiff offered to prove at *fol.* 218, that he had been ill treated by William since he got his property, but the evidence was excluded.

Such a finding of the referee, after excluding our evidence on that point, we submit, is erroneous.

(*g.*) The tenth exception, at *fol.* 154, report 138, is well taken, for the following reasons:

1. George is not a party to the mortgage alluded to. (*Fol.* 197, *et seq.*)

2. The condition of the deed, (*fols.* 32–3,) does not secure the payment to George.

3. The mortgage, at best, is a second mortgage, the lien of which would be destroyed by a foreclosure of the $1,000 mortgage, which is past due.

4. When the father dies that mortgage belongs to his heirs and is half William's. Nothing short of an assignment to George, would make it his property. There is no proof of such assignment; hence there was no security of $1,400 to George; hence no foundation for this finding.

5. The mortgage, as drawn, is an invalid instrument, and void by the terms of it. (*Fol.* 197).

(*h.*) The twelfth exception, (*fol.* 155, report 132,) it appears to me, embraces the most singular reason for denying to a plaintiff a conceded right, or refusing equitable relief, ever before alleged.

I desire to call special attention to this part of the report.

It seems to me that this report says substantially to the plaintiff: True, William has got your farm and personal property without paying for it,—taking it, of course, subject to your support and the incumbrances; true, he threatened to leave you and go far away, unless you gave him the whole; true, he told you that George would abuse you, and harass you until he got your property, and then would squander it; true, he did and said what he could to stir up your dislike of George, and called you an old imbecile, not capable of acting or speaking for yourself, and urged you to hurry up the papers before George should get a guardian over you; true, he rejected all your proposals for a different arrangement, and called you hard names, because you were so slow in acceding to his wishes; true, you stood out against his importunities from November until the 29th of the next January, until, as you say, you were overpowered, and yet you must have yielded to his bland persuasion and convincing arguments; true, you are stripped of your property by William in this way, and yet you had a right to yield; and I am not fully satisfied but that it was the best thing for you, after all; true, William urged this transaction rather too strong, perhaps, and sufficient evidence might be found to restore your property to

you, if it would be for your good, which I doubt; true, the property rightfully belongs to you; but you must remember that you are a weak-minded, infirm, old man, and so powerfully under the influence of William, that, if your property should be restored to you, there is no knowing what will happen to you next; it will be just like you to submit to still greater exactions next time, to keep William at home; and for that reason I think things had better remain just as they are; besides, it is better for William, too, for, although he has perpetrated a great wrong upon you this time, yet, if we take the property away from him and give it back to you, it will make him mad, and he may commit a greater wrong upon you—he may get *everything* next time, owing to your weakness and vacillation, and give you still less in return; for this reason, among others, therefore, let William keep the property,—and your prayer to the court be refused.

The decision of this case, therefore, seems to have turned upon the question, whether the restoration of his property would be of any real benefit to the plaintiff. That question is not in the case. The plaintiff is in court asking for his equitable rights,—for relief against his son's fraud. The referee intimates in his report, that there is sufficient evidence to justify a decree for relief, but refuses it on the ground that he can see no real benefit it would be to the plaintiff to grant it. That ground, I argue, is entirely irrelevant.

The only issues in this case were—

1st. Did William procure that conveyance through the exercise of undue influence over his aged and infirm father?

2d. Did the old man execute that bill of sale without knowing its meaning or effect—supposing, from William's explanation, that it was only a paper to keep George off, &c?

If the first, we were entitled to a reconveyance of the farm.

If the second, the bill of sale should have been adjudged void.

If neither, the judgment is right; if either, it is wrong.

These two are the only issues in the case. It was not in issue whether it would be any real benefit to the plantiff to have his own property. The law says it would; neither was it in issue what he might possibly do with it in the future, if it should be restored to him;—neither was it in issue, whether William would not be more treacherous to his father in the future, than he had been in the past, if deprived of the fruits of his first treachery.

These questions were not before the referee on this trial, and should not, I respectfully submit, have entered into, nor influenced in the least, his final determination.

Cannot a man have his rights in a court of justice, because, forsooth, he may be so weak and vacillating in mind, or much under the influence of others, that he may lose them again?

Then let regular proceedings be had, and a guardian appointed to watch over his interests, and preserve them from harm.

It may be said that the referee afterwards found as a fact in the case, that there was no fraud or undue influence. (*See fols.* 123 and 142). The referee says:—"I do *not* find as a fact in this case, that the *conveyance* was obtained by fraud or undue influence; and I therefore hold, as a matter of law, that the action cannot be sustained."

This relates to the conveyance of the farm only, as I understand it,—not to the bill of sale, as to which the finding is wanting. (See next point.)

But, notwithstanding this language of the referee at the close of his report, what I insist is, he was manifestly influenced in this finding and determination, by the outside and irrelevant considerations before mentioned, which was error.

POINT III.—*Findings.*—(*a*) The first request to find is at *fol.* 160.

The ground covered by this request was considered in connection with the 6th and 7th exceptions; at least so far as I desire to speak upon it at present.

(*b*) The second (at *fol.* 167), embraces the well-known and equitable rule, that whoever is treacherous to the trust and confidence reposed in him by one nearly related, shall not profit by his treachery.

See authorities already cited: (3 *Cow.*, 537–572; 5 *Barb.* 533; 39 *N. Y.*, 463.)

(*c*) The third request (*fol.* 169), relates exclusively to the bill of sale.

The referee has virtually found as a fact in this case, (*fols.* 71, 72, 78, 79, 93, 99, 109, 110,) that the old man signed that bill of sale without knowing what it meant, or understanding its effect; and yet he holds, as a conclusion of law, that this action cannot be sustained.

The old man swears positively that he didn't know what a bill of sale meant; that he was misled by William about it, and his subsequent conduct shows conclusively that he tells the truth.

Willliam admits that the idea of the bill of sale was, that it was only a paper to keep George off; and in the face of the testimony of both parties, the referee could not find as a fact, that the old man knew what he did when he gave that bill of sale.

Now, if he executed that bill of sale under a mistake, a court of equity will relieve him, and set it aside.

If William contributed to deceive him, it is utterly void.

This action is certainly sustainable, therefore, as to the bill of sale.

There is no finding of fact relative to the bill of sale on which to base the referee's conclusion of law, that this action cannot be sustained, at least as to the personal property, the value of which is about $600.

(*d*) The fourth request (*fol.* 172), was substantially argued

with the 10th exception, except so far as it relates to the question of fraudulent intent on the part of William.

Both mortgages cover only the north half of the farm. Why didn't William give the $1,400 mortgage on the south half, if he was acting in good faith, and intended to pay?

He saw, as clearly as we see, that the holder of the $1,400 mortgage must take up the $1,000 mortgage, or have his own mortgage cut off by a foreclosure. By becoming the purchaser he gets rid of the second mortgage, and still keeps the farm.

POINT IV.—The judgment should be reversed, and a new trial granted.

R. RAYNOR, *counsel for defendants.*

This purports to be a suit in equity, to set aside a deed of real estate and also a bill of sale of personal property, on the ground of fraud and undue influence; and also on the ground that the grantor was incapable of fully understanding the nature and effect of such transfer.

The plaintiff is seventy-five years of age, and has no wife or family. He is the father of the defendant, William G. Brand, and of George S. Brand, and these two are his only children and heirs-at-law. Another son, by the name of John, had died about twenty years ago, and was twenty-four years of age when he died. The plaintiff now wanted the comfort and quiet of a good home, and freedom from care; and these he very properly secured to himself, and at the same time executed a long-cherished purpose of making such disposition of his property as he believed to be equitable and just between these two sons, under all the circumstances of the case.

William had lived at home for several years after he was of age, and helped to work, clear up, pay for, and improve the farm; and was prudent, industrious, saving and faithful; while George was an indolent, wandering spendthrift—left

home two years before he was of age, and wandered around from place to place, without application, industry, prudence or faithfulness, to any thing or any body. Of these facts the plaintiff had become deeply impressed, and had often declared to his neighbors and others, that he should bestow upon William the portion of his property that would have belonged to John: and this, there can be no doubt, he aimed to do by making the conveyances in question.

And the conditions and reservations which the plaintiff imposed as the consideration for such transfers and conveyances, form a full, perfect and adequate consideration, for the property conveyed, as appears by the case, at *fols.* 68 to 70. And it also shows that the plaintiff then intended to, and did, reserve property sufficient to give George the full amount he had so often expressed his intention to give him. All which goes to show that the plaintiff had a clear and full understanding of what he was doing, and that he adopted the most judicious manner to do it; and we say, therefore, that the report of the referee was just and equitable, and that the same and the judgment entered thereon, should in all things be affirmed.

I. The judgment in this action ought to be affirmed, because

1st. The referee has found, as a question of fact, that the plaintiff " was not incapable, for want of understanding, from making valid contracts," (*fol.* 91½); and the evidence shows clearly that the papers were carefully read over to the plaintiff and that he said he understood the same, (*fols.* 393 *and* 399); and that the said plaintiff at that time appeared to be capable of doing business (*fol.* 406½).

II. This judgment ought to be affirmed for the further reason, that the referee has found as a question of fact, that said conveyance was not procured by fraud or undue influence. (*See fols.* 124; 127–9; *and* 142–3.)

III. The consideration paid by William for the premises was fully sufficient to uphold the transfer.

1st. He is to pay $1,400, by the terms of the mortgage which he gave back to the plaintiff.

2d. He is to pay the mortgage given by plaintiff and his wife to Irving Brand, of $1,000 and interest.

3d. He is to support and maintain the plaintiff in a comfortable and proper manner, so long as the plaintiff lives, or give him $225 each and every year during his life, and then of course pay the expenses of his funeral.

4th. He is to give up the house occupied by George, and give George a year to take it off, and to occupy it until that time.

IV. The plaintiff reserves:

1st. The wheat sown on the farm and the right to harvest it, and also the wheat in the granary.

2d. All the household and kitchen furniture, beds, bedding, and many other household articles and implements of husbandry.

3d. $600 or $800 in bank.

4th. Several notes against George, and in addition to what George has had while William was absent from home in the western states.

V. Then again at the urgent solicitation and request of the plaintiff, William made a heavy sacrifice of time and expense in coming from Wisconsin down here, to look after the welfare of his father; and upon the like urgent solicitation and request, is induced to leave his new home in Wisconsin, sell out as best he could, and finally accept the offer urged upon him by the plaintiff.

These considerations ought to, and perhaps did, make the plaintiff to be more liberal than he otherwise would have been.

VI. It is enough to uphold and sustain this judgment:

1st. That the transaction was not brought about by fraud or undue influence.

2d. That plaintiff had a perfect knowledge of what he was doing, and was capable of contracting.

3d. That the consideration was good and sufficient.

4th. That it was in accordance with his long-settled con-viction of what was right and just for him to do, and of his often-repeated intention of giving defendant the portion John would have had had he lived.

VII. The testimony of plaintiff is not entirely reliable. He swears he did not say he should give William John's portion, (*fol.* 229½): and several of the neighbors swear he did say so (*see fols.* 344, 365).

Again he swears that William, over persuaded him, this the evidence shows is not true.

William even refused to pay for making the papers the second time. He wanted to be relieved from the urgent importunities of his father, and be allowed to return to his quiet, prosperous, and attractive home in Wisconsin, and offered to take his father with him and to care for him. Then again plaintiff is made to swear that William said "he would not come near him if it were not for his property." This is shamefully untrue and cruel to William.

VIII. All the evidence goes to show that George is the laggard, always behind, always contentious and even abusive to his father, and allowing his family to treat the old man with neglect, contempt, and ridicule; and he it is that is hanging around "after the property." After living there on the farm without any charge for a great number of years, and being supported from his father's granary and crib, has not now the first thing to show as a trophy of industry or frugality; and up to the day of trial, borrowing money of his father to pay little debts with. We ask then again, is there anything strange or unreasonable in the disposition of his property by the plaintiff? The only evidence of "un-due influence" is on the part of George. He procured the plaintiff to destroy the first deed, and the conviction of the plaintiff was so strong of the justness of what he had first done, that after a week or more of deliberation, he did the same thing again, and did it a little stronger than the first time.

Then unable to get him to refrain from it or undo it after the second time, George called in the aid of Mr. Fuller to commence this action; which plaintiff tried to have stopped and discontinued, and even ordered it to be done, (*fol.* 322,) and directed that his wheat be sold to pay the cost. Plaintiff declaring to his neighbors that he did not want the suit brought. (*Fol.* 342.)

IX. We submit, therefore, that the judgment in this action should be affirmed.

FOSTER, J.—Appeal from a judgment rendered for the defendants on the report of a referee.

The plaintiff is the father of the defendant, William G. Brand. On the 29th day of January, 1868, the plaintiff, who was then seventy-five years old, executed to his son, the defendant, a warrantee deed of his farm, containing about seventy-three acres, situated in the town of Geddes, in the county of Onondaga, of the value of from $6,000 to $7,000, the consideration for which was expressed in the deed to be the sum of $5,636.

At the time the deed was executed, there was a mortgage on the north half of the farm, held by one Irving Brand, for $1,000 and nearly one year's interest thereon had then accumulated. And the deed executed by the plaintiff contained the recital that the conveyance was subject to the payment of that mortgage, which the said William G. Brand was to pay, " and also subject to the payment of $1,400, said $1,400 to be paid to George S. Brand, one year after the death of the said Ira C. Brand, according to a mortgage given therefor, and also subject to the support and maintenance of the party of the first part, during his natural life, in a comfortable and suitable manner, or of the payment of the said party of the first part, each and every year of the sum of two hundred and twenty-five dollars, in equal quarterly payments from the 1st day of January, 1868, during his natural life." The deed also reserved to the

plaintiff the crop of wheat then growing on the premises, and the right to George S. Brand, (another son of the plaintiff,) to remove therefrom a house which he had erected thereon and in which he then lived.

The plaintiff at the same time executed to the defendant, a bill of sale of stock and farming utensils on the farm, of the value of from $500 to $600, and the defendant executed to the plaintiff a mortgage on the *north half of the farm.*

The consideration for which was expressed therein at the sum of $1,400, and was stamped with an internal revenue stamp of $1.50, and conditioned " to pay, or cause to be paid to the party of the second part, or his certain attorney, heirs, executors, administrators or assigns, the sum of fourteen hundred dollars, in one year from the death of the said party of the second part, and also subject to the support and maintenance of the party of the second part, during his natural life, in a comfortable and suitable manner, or for the payment to the said party of the second part of $225, in quarterly payments from January 1st, 1868, during the natural life of the said party of the second part, which said sums and conditions herein named, the said William G. Brand hereby covenants to pay and perform."

No other obligation or security was given by William G. Brand to his father, and no pecuniary consideration was paid by him; and there was no legal indebtedness to him from the plaintiff existing, when the said conveyances were executed. Soon thereafter, the plaintiff tendered to William G. Brand, a satisfaction of the mortgage and demanded a re-conveyance of the farm and personal property, alleging that the deed and bill of sale had been obtained by the defendant by reason of fraud and undue influence on his part, but the defendant refused to accept such satisfaction of the mortgage and to re-convey the farm or personal property.

On the 13th of February, 1868, this action was commenced to set aside the conveyances.

The cause was referred and was tried before a referee, and he subsequently found and reported as follows :

[Here the learned judge stated the report at length. *See* p. 222, *ante.*]

Judgment was entered upon the report of the referee, in favor of the defendants, and in accordance therewith ; and the plaintiff appealed. Several exceptions were taken on the trial by the counsel for the plaintiff, to the rulings of the referee, in admitting and rejecting testimony; for refusing to find several matters of fact and conclusions of law, as requested by the plaintiff; and to several of the conclusions of fact and of law, which were found and reported by him; so much of which, as well as such portions of testimony as are deemed material in the discussion of the case, will be adverted to in the opinion.

Before proceeding to the discussion of the questions raised in this case, I propose to advert to the manner in which it has been prepared and argued by the counsel for the plaintiff.

Any important departure of counsel from the line of professional duty, occurring in an oral argument, can be most properly noticed at the time when it takes place; but when, as in this case, the printed points and brief of counsel contain matter highly disrespectful to any member or officer of the court, and inconsistent with that courtesy, or at least civility, which should always be observed between the court and the bar, and more especially when the introduction of such matter is entirely uncalled for, and not warranted by any thing which has transpired ; and where the printed points properly form part of any report of the case; it is the duty of the court to express its views of it in such form that they, too, may become a part of such report. To do less than this might leave the impression, when offensive matter forms part of the report, that such unprofessional proceeding of counsel is countenanced by us.

While it is the right of counsel to canvass freely and thoroughly, all the findings of fact and conclusions of law,

either of a referee or judge, and to point out and expose all errors which they suppose have been committed on a trial, all this can be done without the least indecorum—without giving offense to any one—without any exhibition of ill temper or spleen—and certainly, without evincing an intention to be personally disrespectful to the officer whose decisions are being reviewed.

The points of the plaintiff's counsel are subject to all these objections. The instances which they present are too numerous and extended to warrant the insertion of them here; but they leave no doubt that the counsel was not actuated solely by the desire to correct any errors which the referee had committed; and the tone and manner in which he argued the case, furnished additional evidence that he had other purposes to subserve.

A referee—especially when he is a justice of this court—can only be appointed by the united choice of both parties, and it is very unjust, as well as uncourteous and disrespectful, for the unsuccessful party to assail his motives, either by direct charge or insinuation, unless there is the most satisfactory evidence to sustain such imputation.

In this case there is not one circumstance showing, or tending to show, any partiality, bias, or leaning of the referee towards either party, and most clearly all that could be claimed is that he may have committed mistakes in his decisions.

We can no more countenance any wanton attack upon a referee who is not, than if he were, a member of the court. But it is of some consequence that the counsel, when he prepared his points, knew that the referee would be a member of the court to which they would be presented; and if the wrong towards the referee, as such, was no greater than though he had not been a member, the indecency of it was increased by thus thrusting in his face the insinuations which he had made against him.

The attack was the more inexcusable from the fact,

which we have all observed, that up to the time when this cause was argued, the justice of the court who was the referee, had uniformly and always treated his assailant with much courtesy.

It is objected, on the part of the plaintiff, that the referee erred in excluding the testimony offered by him, to show how the plaintiff was treated by the defendant, after the execution of the conveyance in question, while they were living together on the premises. I think that the referee was right; for while it seems to me, that the offer made was for the purpose of giving proof that the defendant did not treat the plaintiff well and did not conduct towards him as the fair performance of his duty under the deed and mortgage required of him, in the support and maintenance of the plaintiff; yet the proposition offered was not so clear and explicit as to require the referee, without further explanation, to admit the evidence. The offer, in terms, was: "The plaintiff offers to show how he has been treated by William since the deed was given." It was not an offer to prove specific acts of abuse, or of the non-fulfillment of the agreement on the part of William, and I think was too general to require the referee to admit it in evidence; because, for aught that appeared, if the offer had been allowed the testimony when given, would not have tended to prove anything improper on the part of the defendants. And besides, if the plaintiff was competent to contract, and did contract with the defendant voluntarily and without any fraud or undue influence on his part, then, whether the defendant performed his contract or not, was immaterial to the issue; and if the defendant did not support him in the manner provided for, the plaintiff could and should have elected to either support himself, and require the payment to him of the $225 per year, or he should have brought his action to compel the defendant to furnish him with such comfortable support and maintenence as the deed and mortgage called for.

That offer and rejection of it has, however, some bearing upon one of the findings of fact, that "*It seems he still remains with William, eats at his table, and is kindly treated by him, and his wants carefully provided for.*" I do not find any evidence tending to show that the defendant treated the plaintiff kindly, or that he carefully provided for his wants, except the mere fact that the plaintiff continued to live with William; and that, I think, did not warrant the assumption that he was kindly treated or carefully provided for. In one sense, the plaintiff ate at the defendant's table, in that the defendant, under the deed, owned the house, but there is no evidence that the defendant supported him there; while, on the contrary, the testimony shows that, even down to the time of the trial, not only the plaintiff, but the defendant and his wife and family, used mainly the products of the farm for the year previous (which belonged to the plaintiff,) for their sustenance; and the proof also shows that the household furniture on the place still belonged to the plaintiff. Now, if it was immaterial to show, as I have stated, that the defendant did not perform his agreement, it was equally immaterial that he did perform it. And whether material or not, that assumption could only be based upon proof. I find no proof to support it.

It is clear from the whole case, as presented by the report, that the referee considered the question of competency on the part of the plaintiff, and of fraud or undue influence on the part of the defendant, as a close one; and we must take it for granted that he took the facts so assumed and found by him into the account in arriving at the conclusion not to set the deed and bill of sale aside; in that I think, he erred—first, in assuming the fact without evidence, and second, in giving it any weight in the determination of the issue, upon the questions of competency and of fraud or undue influence in obtaining the conveyances.

It is also claimed, on the part of the plaintiff, that the

Brand agt. Brand.

referee erred in admitting the testimony of Mr. Vann against him, on the ground that Vann was one of the counsel for the plaintiff, and could not be allowed to testify to conversations which *he* had with the witness, or with his copartner, Raynor, when consulting them as counsel.

There were three interviews between the plaintiff and defendant with Raynor & Vann, the first being a few days previous to the execution of the former deed which was afterwards destroyed without being delivered to the defendant, at which time they were acting as counsel for the plaintiff. The second being at the time, when that deed was drafted and signed, and the third at the time, when the papers in question were executed, at which time they were acting for both parties, for Vann testifies, " at the second and third times both received counsel with reference to the conveyances of the property." I have no doubt that the law in regard to prohibiting an attorney, or counsel of a party from testifying to the statements of his client against his consent, is the same now as it was before the Code made parties competent witnesses for or against themselves. And although SELDEN, J., in his opinion in the case of *Whiting* agt. *Barney*, (30 *N. Y.*, 330.) comes to the conclusion, that the rule is changed, the case in which that opinion was delivered, I think does not declare any such rule; each of the four judges who concurred with him in a reversal of the judgment of the supreme court, did so on the ground that the communication was made to the counsel, in the presence of the adverse party, and that therefore it was not confidential. The decision of the case, therefore, was made, irrespective of the provisions of the Code, and in conformity with the pre-existing rule, that to be privileged the communication must have been confidential. It was questioned for some time whether the clerk of the attorney or counsel of a party, might not be allowed to testify to communications of the party made to his counsel in the presence of the clerk, on the ground that, being made in the presence and

Brand agt. Brand.

hearing of the clerk, it was not confidential, but it was decided that it *was* confidential and was privileged. And in that respect also, I have no doubt that the rule is the same now. I think it is a mistake to suppose that such communications were privileged, for the reason that before the Code, parties could not be made witnesses for or against each other, and indeed in courts of equity, the plaintiff could then require a defendant to answer his complaint or bill under oath; and such answer so far as it confessed the allegation of the bill, was conclusive evidence, against the defendant, and so far as it denied such allegations, it was evidence for the defendant, and it required the plaintiff to prove the contrary, by more than the testimony of one witness, in order to overthrow the allegations of the answer. And yet, the communications to counsel made by a person who was subsequently made defendant in a court of equity, were privileged to the same extent as if the action was pending in a common law court, and the counsel was not allowed to testify to such communications. (*March* agt. *Ludlam*, 3 *Sand. Ch. R.*, 45; *Crosby* agt. *Berger*, 11 *Paige*, 377, *and cases there cited.*) I think the enactment of section 390 of the Code, does not furnish any reason for changing the rule of evidence. In the first place, it is not to be taken as changing the rules of law or evidence, any further than is manifest from what it says. It allows either party to call the other, or to offer himself as a witness. This merely extends to either party a right not before enjoyed. And why should such additional right, clearly defined by the Code, be construed to give him the still further one, of reaching by means of other witnesses, confidential communications made to them, which by the general rules of evidence in courts of law and equity, were privileged. It is true that the party can at least, partially defend himself from the effects of such evidence, by offering himself to contradict or explain it. I do not think, however, that he should be compelled to do so, for it is enough for the other

party, that the Code has given him the right to call his adversary as a witness, and to compel him to testify to any matter or *thing* that may be deemed material to the issue. I think also, that the recent amendment allowing husband and wife to be witnesses for or against each other, except in certain cases, contains a provision which shows that the legislature has not intended to change the law, as Judge SELDEN seemed to suppose; for in that amendment they inserted a clause to exempt either of them from disclosing confidential communications; and no good reason, I think, can be given why such communications should still remain privileged any more than such as are made to counsel. And again, if communications to counsel are not privileged, and they are competent evidence against the party making them, then in an action after his death, between his personal representatives and another party, they would still be competent, for it is only the party to the action who, in such case is prohibited from testifying to what has occurred between him and the deceased party, while disinterested witnesses are allowed to testify to the acts or declarations of a deceased party, the same as though he were living and party to the action.

I have examined this question further than I should have done, because I am not willing to concede, that the Code has in the least, changed this rule of evidence.

It must be conceded, however, on the authority of that case (and such was clearly the law before that,) that communications to counsel, made in the presence of the adverse party are not privileged ; and of course, Vann was a competent witness to testify to what took place on the second and third interviews had with the plaintiff and defendant ; for so far as appears from the case, the defendant was present all the time.

Such, however, was not the case in regard to the first interview ; for Mr. Vann testifies that William was not present all the time at that interview, while the com

munications of the plaintiff were being made to Mr. Raynor, and he was allowed against objection and exception to testify, as well to what the plaintiff said while the defendant was absent, as what he said while he was present. In this I think the referee erred—communications made to one's counsel as a conveyancer are privileged. (*Greenleaf's Evidence*, § 241; *Cromach* agt. *Heathcourt*, 2 *Brod. & Bing.*, 4; *Wilson* agt. *Troup*, 7 *J. C. R.*, 25.) And a large share of the testimony of Vann consisted of what was said by the plaintiff in that first interview.

It is insisted on the part of the plaintiff that the referee erred in admitting Vann to testify, that in his opinion, the plaintiff was competent to contract when he executed the deed and bill of sale; Vann, though not an expert, was the subscribing witness to the deed, and is within the same principle which allows the subscribing witness to a last will and testament, to give his opinion of the sanity of the testator. (*Dewitt* agt. *Bailey*, 9 *N. Y.*, 371.) And it does not necessarily follow, as is claimed for the plaintiff, that the question put by the plaintiff's counsel to his witness, George Geddes, was improperly excluded.

That question was, "where any fear of difficulty might threaten him or his property, would he in your judgment, be easily persuaded to do any act, dictated by any person he considered a friend ?" Mr. Geddes was not in the proper sense of the word an expert; though he was a man of high character, and actually well qualified to judge, from the continued actions of one with whom he was acquainted, of his sanity, as well as of his competency to transact business; but still he was not competent unless he became so in view of the acts and conduct of the plaintiff which he had witnessed as he had testified. And as to this, it depends entirely upon the question, whether after stating the acts and conduct of the plaintiff, and of his family in regard to his business matters, such statements rendered him competent, in connection therewith to express his opinion. And

yet one acquainted with him, who should hear his statements of the acts and conduct, and character of the plaintiff, would hardly doubt, that in fact he was more competent to express an opinion of the usual mental strength and capacity of the plaintiff, than Mr. Vann was to express an opinion of his condition when the conveyances were executed.

In *Culver* agt. *Haslam*, (7 *Barb.*, 314,) the court held that "on a question as to the mental capacity of the grantor of a deed, the opinion of an intimate acquaintance, not a medical man, as to the condition of the grantor's mind is competent, when connected with facts and circumstances within his knowledge, and disclosed by him in his testimony, as the foundation of his opinion." And it was held that the value and force of the opinion depend on the general intelligence of the witness; the grounds on which it is based; the opportunities he has had for accurate or full observation, and his entire freedom from interest or bias.

In *Jackson* agt. *King*, (4 *Cow.*, 218,) it will be seen that such evidence was received from several witnesses, and while the court did not question its competency, it held that the facts proved by the witnesses, did not support the opinion which they expressed.

In *Stewart* agt. *Lispenard*, (26 *Wend..*, 309,) it will be found that the same kind of testimony in regard to the mental capacity of the testatrix was received, and was considered competent by the court for the correction of errors, and in the opinion of the court it is said, " mere opinions of witnesses" says Judge WASHINGTON, " as to mental capacity are entitled to little or no regard unless supported by good reasons founded on facts which warrant them." To this as a general rule, the opinions of medical men may be considered as an exception, (3 *Wash. C. C.*, 587,) and great stress was laid upon such opinions, based as they were, on the facts stated by the witnesses.

In *Dewitt* agt. *Bailey*, (13 *Barb.*, 550,) the plaintiff was permitted to take the opinions of witnesses, as to the

grantor's *capacity*, founded upon the facts disclosed by them upon the trial, and the court held them to be competent. The case was appealed to the court of appeals, (9 *N. Y.*, 371,) and it appears from the report of the case that the precise question on which the case turned was that the plaintiff's counsel was allowed "to ask the witness whether from what he had seen, and the facts within his knowledge, the old man had capacity to comprehend and transact business?" and the witness answered, "that he had not such capacity." The court of appeals reversed the decision of the supreme court, and granted a new trial.

The cause was re-tried and again on appeal came before the court of appeals, (17 *N. Y.*, 340,) and it appears from the report, that the same questions on which the case had been previously determined, were not propounded to the witness, but after testifying to the facts within their knowledge, they were asked various questions, calling for their opinions of the degree of his mental imbecility; and the court of appeals held such testimony to be proper, and unanimously limited the former decision of that court "as authoritative only for the doctrine that upon a trial involving the mental imbecility of a testator or grantor, a non-professional witness cannot be asked the broad question whether he considered the party *non compos mentis*, or, which is the same thing, incapable of managing his affairs." And in the opinion of the court on page 348, it will be seen that the doctrine that non-professional witnesses, after having stated facts within their own knowledge, may be allowed to give their opinion of the degree of mental imbecility of a grantor or testator.

In the case of *Whelan* agt. *Whelan*, (3 *Cow.*, 550,) it appears that testimony was received, that "the appellant was a man credulous and easily persuaded to anything by those he supposed his friends; and he might be persuaded to do any act dictated to him, when any fear of difficulty might threaten him or his property." It does not appear

that this testimony was objected to, but it does appear (*pp.* 572 *&* 586,) that the court for the correction of errors laid much stress upon it, saying "it is in proof that the appellant was very credulous and easily persuaded by those whom he believed his friends; that he was easily led by William; that the appellant could be persuaded to do any act dictated to him, when apprehensive that his property was in danger." I think, upon the whole, that the opinion of Mr. Geddes should have been received and such weight given to it, as the referee should think, under all the circumstances of the case, it was entitled to.

And I may as well add here, for it bears strongly on the next question to be discussed, that the court, at page 572, laid down the rule, and which is applicable to the case before us: "That a contract obtained from one party so much in the power of the other, cannot be maintained if confidence has been abused, if there is inadequacy of price, or the inference is plain that advantage has been taken of age and imbecility, and the partiality of a parent has been artfully made use of to strip him of his property and reduce him to a state of dependence and want." The proof shows that the plaintiff had no property besides that conveyed to the defendant, except some $500 or $600 deposited in a savings bank; the small amount of household furniture, being in the house on the premises in question; a small amount of the products of the farm for the previous year; and the wheat then growing thereon, which had been sown in the autumn preceding the execution of the deed. His habits had, some years previous, been very bad, and had affected his mind, and for many years previous to the time in question, his business affairs had been mainly managed by his wife or his son, the defendant. And his wife died in the summer of 1867. He had two children, being the defendant, and his son George, who had a wife and four children, and was in very moderate circumstances, his property amounting to not more than $1,000, and that in all he was

indebted to the plaintiff in the sum of about $200, for which he held his notes, and that he had let him have, in addition, from time to time, in one way and another, an amount not exceeding $300 more; and it very clearly appears that, as between the two sons, the defendant was the one most favored, and as against George, had his own way with the plaintiff.

After the defendant became of age he worked for the plaintiff on the farm about six years; during which time he accumulated, from the wages to be paid to him besides his support, about the sum of $1,000; after which he went to Michigan, and remained about one year. He then returned to Onondaga county and rented the premises in question of the plaintiff, for one year, at the rent of $100. He then went again to Michigan; and afterwards returned to Onondaga county in February, 1860; entered into an agreement in writing with the plaintiff, to work for him and manage the farm for him for five years, at the yearly compensation of $180 per year (with his board and washing), payable at the end of each and every year. That agreement was under the seal of the parties, and contained a provision as follows: "The said party of the second part" (William G. Brand,) "shall take and have the general and special management of the carrying on of said farm and the exclusive control of all the business belonging to, or in anywise appertaining to, the management, control and carrying on the said farm for said term. The cultivation thereof, as well as the sale and disposition of all produce, of every name and nature, raised or grown thereon during the said term. The buying and selling of any stock, or other personal property, which the said party of the second part may at any time deem proper. The said party of the second part shall, at the close of each and every year during said term, render unto the said party of the first part a true and faithful account of all moneys had and received by him, for or on account of any and all property so sold by him, and of all moneys paid out and ex-

pended by him, for or on account of the said party of the first part or his family."

It was proved by the testimony of George S. Brand, that William, while at work under this contract, told him that he had a power of attorney to do as he was a mind to, to buy and sell and anything else he chose; and the witness further said: "I asked him what that was for? and he said, father was not capable of doing business, and would go to the poor-house, if he did not have some one to manage the property for him." On the cross-examination the witness repeated the above statement, and also testified that William in speaking of the said contract, said: "he was going to have it so that he could be boss himself." No part of this testimony was contradicted by the defendant. William G. Brand, in his testimony in reference to this contract, said: "The contract under which I worked, was the only authority I ever had during the five years; I did not exercise control, but worked subject to father's advice and counsel; I sold the grain; I kept all the money received from the sale of produce until the end of the year; the settlement was with father and mother together; after the first year, I had no settlement until the end of the contract; during the last four years I paid no money to father or mother; I bought father's clothes, such as was necessary; he never asked for money and I refused." In the year 1866, the defendant continued to work for the plaintiff for one year, at the price of $300 for his services. He then went west again, and remained there until in the fall before the conveyances in question were executed.

It is not claimed that any pecuniary consideration entered into the making of the conveyances, except such as are specified in the recitals of the deeds, and in the conditions of the mortgage, except that the defendant claims that he was entitled to something for leaving his place in the west, and returning to live with his father. And he claims that it was intended by the plaintiff to secure his

own support and maintenance, and to secure the residue of his estate for the benefit of the defendant and of George; and that it was intended by the plaintiff to give him a much larger amount than he meant to give George.

The testimony of Mr. Vann is, that it was the intention of the plaintiff to secure the portion coming to George to his children, and that is the reason alleged by him for not making the $1,400 mentioned in the mortgage, payable thereby to George. But the testimony of the defendant is that the share of George was to be secured to him, and such is the recital in the deed.

Now, nothing can be plainer than that by the conveyances in question, not one dollar was in any way *secured* either to George or to his children. If that matter had rested on the recitals of the deed alone, the defendant would have taken the estate charged, as between him and George, with an equitable lien thereon in favor of George. But it does not rest at all on such recitals, for in the first place, the recitals in the deed declare that the conveyance is "subject to the payment of $1,400, said $1,400 to be paid to George S. Brand, one year after the death of the said Ira C. Brand, *according to a mortgage given therefor.*" And in the second place, the mortgage does not allude to George; but by its express terms the condition of the mortgage is, that "the said party of the first part, his heirs, executors and administrators, shall well and truly pay to the party of the second part, or his certain attorney, heirs, executors, administrators or assigns, the sum of $1,400, in one year from the death of the said party of the second part." So, too, the equitable lien which would have been created by the recital in the deed upon the whole farm, was limited, not only, as I have said, by the mortgage to the benefit of the personal representatives of the plaintiff, and not to George or his children, but the mortgage narrowed the lien and confined it to the premises- described in the mortgage alone, being *the north half* of the farm

only; thus releasing the south half entirely from such lien ór claim.

It is also claimed by the defendant, that a part of the portion of the estate which George was to receive, consisted of the aforesaid demands which the plaintiff held against him, being the notes for about $200, and the other advances of nearly $300, and yet no provision was made in this arrangement for giving up or canceling that debt, or any part of it; and the defendant testified that he "advised his father not to give up the said notes to George." In short, nothing was secured to George of any kind, by that arrangement, except to allow him to remove from the premises a dwelling which he had at his own expense, and with the consent of his father, erected thereon. And this arrangement was so managed with the plaintiff, who, the proof shows, could neither write or read writing, that while at least $3,600 was secured to the defendant, over and above all that was charged upon him either by the deed or the mortgage, nothing was secured to George, and there was nothing to prevent the defendant, if he could induce his father to do so thereafter, from obtaining the whole of the small share which, it is alleged, was intended for George. And it was so arranged that in case the plaintiff should die, without making a further disposition of it, that only one half of that small share would become the property of George, and the other half would be added to the share which *was* secured to the defendant.

Again, there was, as has been said, a mortgage on the *north half* of the farm, in favor of Irving Brand of $1,000, and interest had accumulated thereon, at the time of these conveyances, to about $70. The $1,400 mortgage executed by the defendant was on that same north half alone, and the support and maintenance of the plaintiff, or the $225 per year in lieu of it, was, by the terms of the mortgage, made a specific charge on *that part alone,* and the value of which the referee found to be $1,000. So that while the

value of the whole premises, as found by the referee, was $6,000, the north half was incumbered to the amount in all, of $3,470, while the south half was left to the defendant entirely unincumbered. The incumbrance on the north half being *at that time* more than it was actually worth. But I think the referee overestimated the amount for which the defendant was liable for the support of the plaintiff, when he put it at the sum of $1,000. The estimated life of the plaintiff at seventy-five years, according to the tables, is 4.354 years; of course the whole sum to be furnished by the defendant at $225 per year, would amount only to $979; but this sum was not payable then, but in sums of $225 each year; the interest, therefore, on the whole sum of $979 should be deducted for one half of that time, at six per cent., and after deducting that from the principal, would leave the present value of that sum at $850, being $150 less than the referee has estimated, but it would still leave the incumbrance on the north half of the farm at more than one half his estimate of the whole premises.

So, too, the referee erred in estimating the value of the $1,400 to be paid pursuant to the mortgage. The referee has put it at that amount as of the time when the mortgage was executed; but that could not be so, even if the plaintiff had died the next day, for it is not payable, or on interest, until one year after the death of the plaintiff. But according to the tables, his estimated life being 4.354, and it being payable one year after his death, we must cast the interest on the $1,400 at six per cent. for one year and multiply that by the 5.354, and after deducting the product from the $1,400 it would leave the liability of the defendant, therefor only $950, with interest from the date of the mortgage. So that calling the whole farm only $6,000 and the personal property included in the bill of sale at $500, as the referee has estimated it, the defendant had secured to him the sum of $6,500, while all the liabilities incurred by him is $2.870, leaving him the net sum of $3,630.

The referee found that about $2,000 was intended to be secured to George, and he assumed that it was so secured by the transactions between the plaintiff and defendant.

I have already shown, I think, that nothing was *secured* for George or his children. But, in fact, no such sum was either secured or left (independent of the $600 in the savings bank, and which formed no part of the transaction) for any one; for, in making the estimate of $2,000, the referee took into the account (and it is all which he could include) only the said sum of $1,400, which I have shown in fact to be only $950, and the amounts which George owed his father amounting to $500, so that, of all the property taken into the account, William actually received $3,630 net, and left of that which was intended for George and his heirs, only the sum of $1,450 instead of the $2,000; and *that*, so far as George's interests were concerned, instead of being a security, was a mere sham ; he has no title or security for the $1,400—he still owes his father the $500 or $600.

And he has no security that the defendant who the referee thinks, can obtain from the plaintiff whatever he tries to, and gives as one of the reasons why the conveyances should not be set aside, that it might be worse for him, and that the defendant in such case might get all that he now has, together with the residue of his property. I say George has no security that William will not succeed, if this transaction is allowed to stand, in obtaining from the plaintiff while living with him, the small residue of his property, which by the transaction in question, was intended by the father, for George. If I have correctly stated the legal results of the transaction in question ; how is it possible that the plaintiff, if competent to transact business, and also if not unduly influenced, could ever have consented to dispose of his property by such legal instruments as he then executed ? And it is surprising to me that good lawyers, if the object of the parties was what Mr. Vann testifies it was, should have prepared for them a deed, bill of sale and

mortgage in the form of the ones which were executed, without anything to secure either to George or his children, any portion of the property. Surely no good lawyer *should* have prepared such papers for such an object, and it is difficult to believe that any really sane man who was not improperly influenced, would ever have signed them.

The facts which I have referred to, and the several specific facts found by the referee, taken as a whole, appear to me to be adverse to his general conclusion, that the plaintiff was not incompetent to contract, and that it is not proved that the defendant committed a fraud, or unduly influenced him. The referee also found that he was liable to be improperly influenced by either of the sons. I am convinced from what appears in this case, that the defendant could so influence him. But, though at various times, the defendant was entirely away from him, and George was so situated that he had abundant opportunity, and with the mother, who the case showed favored George, there is not the least evidence to prove that he ever attempted to get control of his father's property, in anyway, or to exercise any control over it, or him.

The only thing appearing in the case from which the referee could have drawn his inference is, that during twenty years and upwards, after George became of age, he had of his father in all, the $500 above mentioned, and which was conceded to be a debt due from him to his father, and for a part of which his father held his notes; together with the fact that he assisted his father in getting up the first deed to William, before it was delivered, and in his attempt to cause the conveyances in question to be canceled, and although two witnesses testify that the plaintiff said he should let the deeds stand if it had not been for George, and other like statements. Both the plaintiff and George testify that in each instance, the plaintiff came to George complaining of the conduct of William in obtaining the conveyances to be executed, and asking his assistance.

But it is very clear that this case does not disclose that any attempt has been made by George to obtain any disposition of this property in his favor.

Upon the direct evidence of competency of the plaintiff, Mr. Vann, who was the subscribing witness, thought him competent when the papers were executed. It does not appear that he had any acquaintance with him, so as to be able to speak except from what *then* took place, while to say nothing of the opinion of Mr. Geddes, whatever it may have been, his testimony concerning the acts, conversation and conduct of the plaintiff, several years before that, and on repeated occasions, show in my judgment that his mind was then not only feeble but that it was disordered to a very considerable extent, and no attempt has been made to prove that, since that, as he grows older, the general character of his mind has improved. I think the defendant should not be allowed to claim that the plaintiff was competent to contract, in so important a transaction as this was. He would not trust to any will that the plaintiff should make in his favor, because he alleged George would break it. But how could he fear that George would break such will, if the testator was of sound mind, and competent to make it. But stronger testimony than this to show that William did not consider him competent, is to be found in the argument which he obtained for the working of the farm for the five years; for the purpose of being boss himself, and securing to himself among other things, the sole right, not only to sell products and stock, when and how he pleased, but to purchase also as he pleased.

I will refer to one other fact which was established, that the defendant in order to induce him to make these conveyances, told him that George was about to have a committee appointed over him, and urged for that reason the speedy execution of the papers. This was not in any way denied by the defendant, and the failure to deny it, was not from inadvertence, for the plaintiff testified to it

three times in his several examinations. If it was untrue it is of itself evidence of falsehood and fraud on the part of the defendant, and also that the defendant must have known that the mind of the plaintiff was very weak. And if it was true, and William did not mean to cheat the plaintiff in the execution of the papers, it furnishes evidence that the plaintiff was considered by George to be then incompetent to manage his affairs; and that the defendant also believed so, and that it was probable such an attempt, if made by George, would be successful. In either aspect it appears to me to be fatal to the conveyances.

A number of other questions are presented by the case, but I am satisfied that this judgment should be reversed, as well upon the questions of evidence which have been adverted to, as upon the findings of the referee; I think, the case shows a much stronger one for an interference to set aside the conveyance, than was that of *Whelan* agt. *Whelan*, (3 *Cow.*, 537, 572;) *Brice* agt. *Brice*, (5 *Barb.*, 533,) & *Voorhees* agt. *Voorhees*, (29 *N. Y.*, 463, 467.)

The case is still stronger in favor of the plaintiff in regard to the bill of sale. It is perfectly clear to my mind, that the plaintiff only intended to give the use of the personal property to the defendant, and that for one year only. In regard to that, Mr. Vann testified, that when the parties came to the office of Raynor & Vann, the plaintiff expressed his intention of giving the personal property to William, and he speaks of this property having been the subject of conversation in the second interview. In this, I have no doubt he was mistaken, he was not the person with whom they consulted. It was his partner with whom they talked, and who advised them what to do, and although Mr. Vann was his co-partner, and doubtless, heard much of what was said, he might well have mistaken as to whether anything was said about the personal property, (except the $600 in the savings bank,) in the second interview, and also whether the proposition to let the defendant have the personal prop-

erty, occurred at an early or late stage of the third interview; at all events, his testimony in that respect, is in direct conflict with that of the defendant as well as of the plaintiff. Neither of them state that anything was said about this personal property previous to the third interview, or that it was at an early part of that interview, and there is no contradiction between them in the fact that the plaintiff did not propose to give it to him at any time. It nowhere appears from the testimony of William that his father agreed to give him the property, but he says expressly that his father proposed to give him the use of it, and he does not in any way state the length of time such use was to be given, nor does he even state that in any way, except by the language used in the bill of sale, any intention was manifested to give him the property as his own. And yet, before he was examined, his father had testified, "I told William, I should hang on to the personal property any way," then he wanted some paper to keep George from suing him for the use of it after I was dead; I asked Raynor if he had got that thing up to keep George off, and he said yes; he brought it to me and I signed it; I did not know what it was; George was not there; I sat back and did not say much. Willie would put in before I had a chance; William would not sign any mortgage to me until I signed the paper to keep George off."

Again he testified, "I had told them at Raynor's office, that I would not let William have the personal property; then Raynor advised William to buy the personal property, and William did not make much reply; I offered to sell it to him, but he would not buy it, *then I offered to give him the use of it for a year*; and then he wanted the writing got up to keep George from making him pay for the use of it."

When William was called as a witness he testified, "I wanted control of the whole; he said he would give me a deed of the whole, but he wanted to keep the personal

property; I told him I could not afford to work and raise grain and keep cattle, hogs and hens, and whenever there was a pound of butter to sell it was his, and he was to have the money; he said then he would give me the use of the personal property; I told him I wanted something to show that in case he should be taken away, George could not sue me for the use of the personal property; said he would fix it so he could not." So, that the only testimony there is to fix and limit the *use* is that of the plaintiff, who states it was for one year, and this is not contradicted by the defendant.

Now, it is not enough in such a case as this that the bill of sale may have been read to the plaintiff, for it is apparent from the whole case, that the plaintiff would not have executed it, if he had not been improperly led to believe that it only transferred the *use* of the property for one year.

I think the judgment should be reversed and a new trial granted, with costs, to abide the event.

Morgan, J.—This being an equity case, the exceptions are not to be viewed with the same strictness as in actions at law.

It is supposed that an error was committed by the referee in refusing to allow Mr. Geddes to testify whether, in his judgment, the plaintiff would be easily persuaded to do an act dictated by any person he considered his friend. Mr. Geddes had already been permitted to give his opinion of the plaintiff's ability to transact business, and as to his soundness of mind. He had testified that in his opinion, he was a man of inferior mind, badly shattered by bad habits, and that he was never sound in his mind since he knew him; and he gave illustrations to fortify his opinion. It seems to me, therefore, that it was very much in the discretion of the referee, whether the examination should go further and Mr. Geddes be permitted to state his opinion upon a hypothetical

case. I have no recollection of any such exception, and while I do not deem it of sufficient importance to call for a new trial, I am ready to *acquiesce* in the views of my brethren upon the point, and agree to a new trial if they deem it of sufficient importance to call for one.

Another objection is, that the mortgage did not provide for the payment of the $1,400 to George S. Brand. But the deed did make that provision and referred to the mortgage, which was silent on the subject as to whom the payment of the $1,400 was to be made. In the absence of the condition contained in the deed, it is true the payment of the $1,400 would have to be made to the administrators of the grantor. But the defendant having accepted the deed is clearly bound by the condition, notwithstanding the language of the mortgage. If both are left to operate, then the defendant would be required to pay $1,400 to his brother George, and another $1,400 to the plaintiff's administrators. But the case is too clear to admit of argumentation, that the language of the mortgage failed to express in full the agreement of the parties, and a court of equity would have no difficulty in correcting it, so as to conform to the condition of the deed, and the real contract entered into between the parties.

A good deal of stress is laid upon the mistake of the referee in estimating the amount secured to George S. Brand, and a close calculation is made to show that he did not obtain as much by the settlement as was charged to him. I have not called to my aid the Northampton tables, to ascertain what a nice calculation would furnish as the net result of the settlement. It is clear that the referee did not attempt to state the amount with accuracy, nor did the parties when they entered into the arrangement, make any such calculation. A mistake of the referee in that respect in not fatal to the judgment; no doubt it was discretionary with the plaintiff to secure to his son George, any sum he pleased as his portion of his property; he fixed the sum

after a good deal of discussion about it; and it is not for the court to break up the arrangement, because he did not make it larger.

If the plaintiff was not over-reached or misled by the defendant, the inadequacy of the sum has but very little, if anything, to do with the merits of the case.

It is said the referee has found as a fact, that the plaintiff still lives with the defendant, eats at his table, and has his wants kindly provided for, and yet, evidence was excluded to show the contrary. The evidence set out in the case, does not affirmatively show whether the old gentleman is, or is not, kindly treated by the defendant, but shows that he still lives with the defendant, and eats at his table. The offer was in general terms to show *how* he was treated. If that fact was material, the evidence ought to have been admitted. The offer, however, was not pointed enough to show that the defendant had treated his father unkindly or failed to provide for his wants. But the provision in the deed of settlement, was drawn so as to permit the old gentleman to take his board elsewhere, in case he did not prefer to remain in the defendant's family. It is very suggestive that the old gentleman still lived with the defendant, and eat at his table, when he could have run over to his son George's house in a minute's time, and had his wants supplied. The whole case seems to support the evidence that the plaintiff was not suffering from bad treatment in the defendant's family. As the offer of evidence objected to, did not necessarily point out any ill treatment in the defendant's family, it is not of sufficient consequence perhaps, to call for a new trial.

It is also objected, that the fact mentioned by the defendant to the old gentleman, that George was about to institute proceedings to put him under guardianship, is conclusive evidence that the defendant brought improper influence to operate upon the plaintiff, to induce him to make the settlement.

It does not appear affirmatively that his son George threatened to institute any such proceedings—but it seems to have been taken for granted on the trial, that he had made such threats.    The question was not asked George.

Without doubt, such a fact if unfounded, or if well founded, if it was used to persuade the plaintiff to do an act which he would not otherwise be likely to do, ought to be sufficient to induce the court to break up the settlement.

While the evidence does not satisfactorily show that this fact in any manner influenced the plaintiff in making the settlement, it called upon the defendant to show on his part that it was fairly made, and that every opportunity was afforded to the plaintiff to understand the act he was about to perform, and as the plaintiff was confessedly a weak minded man, and easily persuaded to adopt a particular course of conduct at the instance of the defendant, the court should require the most satisfactory proof, that the act performed was his own act, while in a condition not only to understand its effect, but sufficiently independent to refrain from its performance if he did not approve of it.

And this brings us to the inquiry whether the evidence of Mr. Vann, the attorney, was admissible to show that the plaintiff was fully informed of the effect of the settlement before it was made; for without his evidence, I have no hesitation in saying that the settlement ought to be set aside.

In my opinion his evidence was admissible for that purpose.    The grounds of objection are fully stated in the case. It appears that Mr. Richard Raynor drew the papers, and that Mr. Vann was his partner and heard the conversation between the parties, and read over the papers carefully to the plaintiff.    There were at least three interviews in which the terms of the settlement were freely discussed.

The first day the bargain fell through, because the plaintiff was unwilling to give a bill of sale of his personal property. The next day the plaintiff went again to the office with his

son George, and canceled the deed, and he afterwards concluded to accede to the requirements of the defendant, and went back again to Raynor's office, and the writings were completed. Mr. Vann says, he is not sure that William was present all the time the old man was; but no objection was taken that any of the conversations took place in the absence of William.

The objection is, that Vann was one of the attorneys of the plaintiff at the time, and the conversations were confidential—and that since the transaction, Raynor & Vann have refused to act as counsel for the plaintiff, on the ground that they were counsel for William. After the testimony was closed, the plaintiff's counsel moved to strike out Vann's evidence, upon the ground that William received advice from Raynor & Vann, with reference to the conveyance, and acted as counsel for both parties in said interviews, and that the statements of both parties were privileged. Another ground for the motion was, that Raynor & Vann were not the regular attorneys or legal advisers of either party prior to the interviews, but were employed and paid by both parties for their advice and services. And especially because Raynor & Vann must have known from what had taken place at the second interview, that there would be a law-suit on account of George's hostility to the settlement, and therefore, the statements made at that interview were privileged.

These objections are frivolous, except so far as they involve the question as to whether the statements of the plaintiff were privileged communications. The attorneys were the legal counsel and advisers of both parties at the time, so far only as the form of the settlement was concerned. But it seems Mr. Raynor took it upon himself to advise the old man not to make such a settlement, and suggested that $225 a year was not sufficient for his support.

But no objection is, or can be taken to this friendly admonition. The parties were there to make their own

arrangements; and it is an entire misapprehension to suppose that any law-suit was contemplated at the time, or that any statements were made or advice given in expectation of a law-suit.

Nor is there the slightest pretext for saying that any of the matters disclosed by Mr. Vann, were confidentially or professionally intrusted to him or his partner Mr. Raynor, by the old gentleman or by his son William. It would be a waste of time to take up the matters sworn to one by one, in order to show that none of them were confidentially communicated to Mr. Vann. They were not stated to him in order to obtain his advice as counsel to regulate their future conduct, but to enable him to draw the papers. They were the statements of both parties, and not the secret of either, so as to require concealment. Doubtless, the authorities are not all one way in relation to the admission of this species of evidence; but since the decision of the court of appeals in *Whiting* agt. *Barney*, (30 *N. Y.*, 333,) the law must be considered as settled in this state that the attorney may testify to a negotiation or bargain between the parties, when he had been mutually consulted by them. And so it seems when only one of the parties consults the attorney. (*Prouty* agt. *Eaton*, 41 *Barb.*, 410, *and see* JOHNSON, J., (*p.* 416,) *as to what was decided in Whiting* agt. *Barney*, (38 *Barb.*, 398,) *and subsequently overruled in* 30 *N. Y.*, 330.)

I am clearly of opinion that the case of *Whiting* agt. *Barney*, controls this case and that the testimony of Vann was admissible as to what transpired between the parties at the time of the negotiation in Mr. Raynor's office.

But there is another ground upon which the evidence was admissible. The plaintiff himself had already testified to the same matters, and thus waived any right he had to keep the matter secret or privileged from disclosure. This is too obvious to be seriously questioned.

At the time of the trial, Mr. Vann had dissolved his con-

nection with Raynor, and had no further interest in the suit; he was the partner of Mr. Fuller, the plaintiff's attorney, and his evidence was entitled to full credit; he testified without bias, and in such a manner as to command the fullest confidence in his statements. And I think, no one can read his testimony, without coming to the conclusion that the old gentleman was fully informed of the consequences of the act he was about to perform. The subject of the bill of sale was fully explained to him, and led to the abandonment of the settlement the first day; afterwads he agreed to it, and told some of his neighbors that he had parted with all his property. When it is recollected that he broke off the first negotiation, because his son insisted upon the bill of sale, it can hardly be said that he did not know what it was. If he had any capacity for business, he must have known that he was required to sign it before William would consent to enter into the arrangement. After a good deal of hesitation, and without any undue influence, as it seems to me, he consented to sign it, with certain restrictions dictated by himself.

If the case is one where the referee has a right to find upon the evidence, that the plaintiff was not of unsound mind, it was also a case where I think, he had a right to find, that the settlement was not obtained by the fraud or undue influence of the defendant. If Mr. Vann's evidence is to be credited, then it is entirely clear that the plaintiff was reckless in his statements as to what took place between him and his son William, and very little if any credit could be placed in what he said. The testimony of William was clear and straight-forward.

Nothing appeared in his evidence to show that he had attempted to make out a case by suppressing the truth or exaggerating it. And it was corroborated in many important details by the evidence of Irving Brand and his neighbors. While I am entirely satisfied with the judgment, I shall be glad to have the case submitted to a jury for their

determination. When they have seen the witnesses and heard them testify, and weighed the evidence, their verdict ought to be satisfactory to both parties. If the case goes back for a new trial, the referee should be discharged and issues settled. The only two questions of importance are, first, whether the plaintiff was of sound mind when he made the settlement, and if so, whether the settlement was procured by fraud or undue influence. The referee may have mistaken the character of the witnesses and the import of the evidence. No one is a good judge of his own bias in such a case, and I may have been misled by it. All that can be claimed is, that my conclusions were honestly drawn from the facts as they appeared to me on the trial.

BACON, J.—I am not prepared to say that, on the merits of this case, I should be disposed to differ from the conclusions of the learned referee touching the mental capacity of the plaintiff, and his freedom from such influences as the law has stamped as undue and illegitimate. On such questions, much is necessarily submitted to the judgment and good sense of a referee, which the court that does not see the witnesses, and has, therefore an imperfect opportunity to judge of the bearing and reliability of their testimony, cannot so well appreciate.

Without, therefore, expressing any opinion on the main facts disclosed by the testimony, and waiving their consideration, I shall vote for a reversal of the judgment and the granting of a new trial solely upon the erroneous ruling of the referee, as I consider it, on a single point. It is the rejection of the question propounded to the witness, George Geddes, at the 249th folio of the case. The principle of law involved in this point is fully discussed in the opinion of my brother FOSTER, and the authorities cited, which show, in my judgment, that the question was entirely proper and should have been allowed. What weight might have been attached to the testimony is not a subject of dis-

Brand agt. Brand.

cussion, but that it was competent, I think, is very clear from the authorities. The rule is well stated in the case of *Cohn* agt. *Haslam*, (7 *Barb*. 314.) that on a question of mental capacity the opinion of an intimate acquaintance as to such condition is competent when connected with facts and circumstances within his knowledge, and disclosed by him in his testimony as the foundation of his opinion, Mr. Geddes stood in this relation substantially to the plaintiff, and he disclosed facts and circumstances which well qualified and authorized him to express an opinion on the precise point on which it was proposed to interrogate him.

It may be well also, in case of a new trial to express an opinion as to the competency of the evidence given by the witness Vann, which was received by the referee under the objection that the matters he testified to, being the communication of a client to his counsel, they were received under the professional seal of secrecy, which could not be broken without the express assent of the client. Perhaps the rule is not yet established in this state, (although there are stong intimations to that effect,) that where a party offers himself as a witness, he may be interrogated as to any admissions or statements made to his counsel, and the counsel may be examined as to the same matters by the opposing party, either in chief or by way of impeachment. If it were necessary, I think, I should be prepared to hold this doctrine. But on another ground, the evidence of Vann was competent. The communications which passed between the plaintiff and Vann, were not in reference to any suit then pending or contemplated. They were made with the object of avoiding any legal controversy by bringing about an amicable arrangement, and with a view to the future conduct and relations of the plaintiff and his son the defendant. The case of *Whiting* agt. *Barney*, (30 *N. Y.*, 330,) holds that the rule which protects the disclosure of professional communications of clients to their attorneys only extends to such communications as

Brand agt. Brand.

have relation to some suit, or other judicial proceeding then pending, or anticipated. Within this rule, the evidence objected to was clearly competent, and was properly received by the referee.

But on the ground heretofore stated, I am in favor of reversing the judgment and sending the case to a jury, as one very proper to be passed upon by them, on the issues of the mental capacity of the plaintiff, and the alleged fraud, or undue influence of the defendant.

NOTE.—A very short explanation only (if any), is necessary in the case of *Brand* agt. *Brand* which occupies nearly this entire number. It will be seen at once that it is a *leading case*, and is nearly parallel with the case of *Whelan* agt. *Whelan*, 3 *Cowen*, 537, which occupies 53 pages of that book. It involves not only the important question of "undue influence" contained in *Whelan* agt. *Whelan*, but also the very important question of "privileged communications;" both of which questions are discussed with great ability by Judge FOSTER.—REP.